**Frank M. MILLER, Jr., Appellant,**

**v.**

**Peter J. FENTON, Superintendent, Rahway State Prison, Irwin I. Kimmelman, Attorney General, State of New Jersey, Appellees.**

**No. 83–5530.**

United States Court of Appeals,
Third Circuit.

Argued Jan. 24, 1984.

Decided Aug. 17, 1984.

Rehearing and Rehearing In Banc
Denied Sept. 28, 1984.

Joseph H. Rodriquez, Public Defender, Claudia Van Wyk (Argued), Paul M. Klein, Asst. Deputy Public Defenders, East Orange, N.J., for appellant.

Irwin I. Kimmelman, Atty. Gen. Arlene R. Weiss (Argued), Deputy Atty. Gen., Division of Criminal Justice, Trenton, N.J., for appellees.

Before GIBBONS and BECKER, Circuit Judges, and ATKINS, District Judge.*

## OPINION OF THE COURT

BECKER, Circuit Judge.

This is a habeas corpus case brought by Frank M. Miller, Jr., who was convicted in New Jersey state court of the murder of Deborah Margolin. In his habeas corpus petition, Miller alleges that his confession to the murder was involuntary, because the police detective's mode of questioning created psychological pressure that induced him to confess against his will. The New Jersey Supreme Court held that the record supported the trial court's conclusion that Miller's confession was "voluntary," and thus admissible under the controlling precedents. We have carefully reviewed the record and conclude that the factual findings of the state court are supported by the record. We therefore conclude that we must accord these findings the presumption of correctness provided for in 28 U.S.C. § 2254(d). *See Patterson v. Cuyler,* 729 F.2d 925 (3d Cir.1984). Given the findings and the presumption, we cannot say as a matter of law that the mode of interrogation used by the detective who questioned Miller rendered the confession involuntary, and accordingly we will affirm the judgment of the district court denying Miller's application for the writ of habeas corpus.

## I. *FACTS AND PROCEDURAL HISTORY*

On August 13, 1973, at about 11:30 a.m., while Deborah Margolin was sunbathing on the porch of her home in rural East Amwell Township, a stranger approached in an automobile and informed her that he had seen a heifer loose at the bottom of the

* Honorable C. Clyde Atkins, United States District Judge for the Southern District of Florida, sitting by designation.

driveway. The stranger offered to help her retrieve the cow. Ms. Margolin declined the offer of help, and then proceeded alone in her brother's automobile to retrieve the heifer. Her brother found the automobile about half an hour later; the keys had been left in the ignition.

When Ms. Margolin failed to return by late afternoon, her family commenced searching for her. Her father eventually found her dead, face down in a creek, with her throat and breast cut. The New Jersey State Police were then called. A number of troopers and detectives arrived on the scene at about 7:30 P.M., and took a description of the car and the stranger from the victim's brothers, who had seen him drive up. Miller, who lived nearby and was known to the troopers, had been convicted in 1969 of carnal abuse and arrested in 1973 for statutory rape. One of the officers, Trooper Scott, recalled that Miller drove a car that matched the one described by the victim's brothers—an old white car with the trunk tied shut and two dents in the side. Detective Boyce of the State Police confirmed the descriptions of the car and also concluded that the description of the stranger given by the victim's brothers matched Miller's general physical characteristics.

The police located Miller at his place of employment, P.F.D. Plastics in Trenton, at about 10:50 P.M. on the evening of the murder, and questioned him there. Miller agreed to accompany the officers to the police barracks for further questioning, and, without being searched, turned his penknife over to the officers. After spending about seventy-five minutes in the barracks kitchen with Trooper Scott, during which he was not questioned, Miller was taken into an interrogation room by Detective Boyce and read his *Miranda* rights. Miller signed the *Miranda* card, and specifically asked Boyce for a clarification of his

right to terminate questioning, which Boyce gave him.[1]

The state police made a tape recording of Miller's statement.[2] Boyce spoke in a soft and friendly—even sympathetic—voice. He thus presented himself as a "nice guy," friendly to the suspect and interested in solving his problems. In response to Boyce's questions, Miller first described his activities on the morning of August 13. Boyce then pointed out various discrepancies in Miller's story about how he passed the time during which the murder occurred, the similarity between the description of the car given by the victim's brothers and Miller's car, and other incriminating evidence. At that point, Miller weakened:

BOYCE: Now, what would your conclusion be under those circumstances, if someone told you that?

MILLER: I'd probably, uh, have the same conclusion you got.

BOYCE: Which is what?

MILLER: That I'm the guy that, that did this.

BOYCE: That did what?

MILLER: Committed this crime.

After this, Boyce shifted gears. Boyce stated that in his opinion, Miller wasn't a "criminal," and that he didn't have a "criminal mind." Rather, Boyce asserted that Miller had a "problem," for which he needed help, not punishment. Boyce then led Miller to talk about his need for help, the psychiatric treatment he received as a condition of his parole from a prior conviction, and his recent statutory rape arrest.

With this background out on the table, Boyce began appealing to Miller's conscience:

B. Okay, listen Frank, If I promise to, you know, do all I can with the psychiatrist and everything, and we get the proper help for you, and get the proper help for you, will you talk to me about it?

---

1. The adequacy of the *Miranda* warnings and waiver are not contested on appeal.

2. We have listened to that tape, and have read the transcript as well (both are part of the

record); hence, we are in a position to describe Detective Boyce's and Miller's mood and their relationship during the interrogation.

M. I can't talk to you about something I'm not ..

B. Alright, listen Frank, alright, honest. I know, I know what's going on inside you, Frank. I want to help you, you know, between us right now. I know what [sic] going on inside you. Frank, you've got to come forward and tell me that you want to help yourself. You've got to talk to me about it. This is the only way we'll be able to work it out. I mean, you know, listen, I want to help you, because you are in my mind, you are not responsible. You are not responsible, Frank, Frank, Frank, what's the matter?

M. I feel bad.

B. Frank, listen to me, honest to God, I'm, I'm telling you, Frank, (inaudible). I know, it's going to bother you, Frank, it's going to bother you. It's there, it's not going to go away, it's there. It's right in front of you, Frank. Am I right or wrong?

M. Yeah.

Miller then began, step by step, to make damaging admissions concerning his participation in the murder. At first, he insisted that, although he was with the victim when she was killed, some unknown stranger had actually committed the crime while they were searching for the heifer. Miller insisted that he had tried to get help, but that, when he realized the victim was dead, he had panicked and dropped the body off. Boyce allowed this much to come out, but then challenged Miller, saying "[y]ou killed this girl, didn't you." Miller again denied having committed the crime, after which Boyce changed gears again, telling Miller—again in soft, pleading tones—that he could only be helped if he "told the truth"—admitted the crime. The following exchange then took place.

B. Honest, Frank? It's got to come out. You can't leave it in. It's hard for you, I realize that, how hard it is, how difficult it is, I realize that, but you've got to help yourself before anybody else can help you. And we're going to see to it that you get the proper help. This is our job, Frank. This is our job. This is what I want to do.

M. By sending me back down there.

B. Wait a second now, don't talk about going back down there. First thing we have to do is let it all come out. Don't fight it because it's worse, Frank, it's worse. It's hurting me because I feel it. I feel it wanting to come out, but it's hurting me, Frank. You're my brother, I mean we're brothers. All men on this, all men on the face of this earth are brothers, Frank, but you got to be completely honest with me.

M. I'm trying to be, but you don't want to believe me.

B. I want to believe you, Frank, but I want you to tell me the truth, Frank, and you know what I'm talking about and I know what you're talking about. You've got to tell me the truth. I can't help you without the truth.

M. I'm telling you the truth. Sure, that's her blood in the car because when I seen the way she was cut I wanted to help her, and then when she fell over I got scared to even be involved in something like this, being on parole and ...

B. I realize this, Frank, it may have been an accident. Isn't that possible, Frank? Isn't that possible?

M. Sure, it's possible.

B. Well, this is what I'm trying to bring out, Frank. It may be something that, that you did that you can't be held accountable for. This is, I can help you, I can help you once you tell me the truth. You know what I'm talking about. I want to help you, Frank. I like you. You've been honest with me. You've been sincere and I've been the same way with you. Now this is the kind of relationship we have, but I can't help you unless you tell me the complete truth. I'll listen to you. I understand, Frank. You have to believe that, I understand. I understand how you feel. I understand how much

it must hurt you inside. I know how you feel because I feel it too. Because some day I may be in the same situation Frank, but you've got to help yourself. Tell me exactly what happened, tell me the truth, Frank, please.

M. I'm trying to tell you the truth.

B. Let me help you. It could have been an accident. You, you've got to tell me the truth, Frank. You know what I'm talking about. I can't help without the truth. Now you know and I know that's, that's, that's all that counts, Frank. You know and I know that's what counts, that's what it's all about. We can't hide it from each other because we both know, but you've got to be willing to help yourself. You know, I don't think you're a criminal. You have this problem like we talked about before, right?

M. Yeah, you, you say this now, but this thing goes to court and everything and you ...

B. No, listen to me, Frank, please listen to me. The issue now is what happened. The issue now is truth. Truth is the issue now. You've got to believe this, and the truth prevails in the end, Frank. You have to believe that and I'm sincere when I'm saying it to you. You've got to be truthful with yourself.

Miller then began disgressing, talking about how he was "framed" by a detective in connection with his prior conviction and put in prison, and how "this is going to kill my father." Boyce continued to redirect Miller toward the murder, and finally the confession came out. The entire interrogation lasted about fifty-eight minutes. There were no threats or explicit promises made, and no physical coercion. Miller, who was coherent throughout the questioning, passed out at the end.

The state trial court refused to suppress the confession,[3] and Miller was convicted after a four-day trial.[4] A three-judge panel of the Appellate Division of the New Jersey Superior Court reversed unanimously, stating "we deplore the techniques and tactics which extracted this confession and which, in our judgment, denied defendant due process of law." The court's opinion, which is principally composed of quotes from the interrogation transcript, characterizes Boyce's method of interrogation as "psychological pressure," and in a short conclusion invoked the "the fair winds of due process" which "blow on the guilty as well as the innocent."[5]

The New Jersey Supreme Court, in a 4–3 decision, reversed the Appellate Division and reinstated the conviction. *State v. Miller*, 76 N.J. 392, 388 A.2d 218 (1978). The court stated the appropriate legal standard:

Every case must turn on its particular facts. In determining the issue of voluntariness, and whether a suspect's will has been overborne, a court should assess the totality of all the surrounding circumstances. It should consider the characteristics of the suspect and the details of the interrogation. Some of the relevant factors include the suspect's age, education and intelligence, advice as to constitutional rights, length of detention, whether the questioning was repeated and prolonged in nature and whether physical punishment or mental exhaustion was involved. *Schneckloth v. Bustamonte*, 412 U.S. 218, 226, 93 S.Ct. 2041, 2047, 36 L.Ed.2d 854, 862 (1973). A suspect's previous encounters with the law has been mentioned as an additional relevant factor. *State v. Puchalski*, 45 N.J. 97, 101, 211 A.2d 370 (1965).

76 N.J. at 402, 388 A.2d at 223. The court then proceeded to make subsidiary findings on the relevant factors, and applying the "totality of the circumstances" standard, held that the use of the "friendly cop"

---

**3.** In declining to suppress the confession, the trial court relied on the absence of an inducement.

**4.** Miller was sentenced to life imprisonment.

**5.** The quotes in this paragraph are taken from the unpublished opinion of the appellate division, State v. Miller, No. A–1275–73 (N.J.App. October 27, 1975).

approach by Boyce did not overbear Miller's will. The court relied primarily on the following facts: the interrogation was not excessively long, Boyce at no time misled Miller into thinking he was anything but an interrogating police officer, and Miller understood the significance and probable outcome of confessing to the killing of Deborah Margolin. *Id.* at 403–04, 388 A.2d at 224. The court held that "the interrogation in this case did not exceed the proper bounds and that the voluntariness of defendant's confession could properly have been determined by the trial court to be established beyond a reasonable doubt." *Id.*

Miller petitioned for a writ of habeas corpus in the United States District Court for the District of New Jersey. The petition was referred to a magistrate, who recommended that the writ be denied. The district court agreed, rejecting Miller's contention that the psychological pressure created by the questioning made the confes-

sion involuntary in the constitutional sense. The district court held that, based on its independent review of the evidence, including the tape of the confession, Miller's will was not "overborne" by Boyce's questioning. The court adopted the magistrate's recommendation denying the writ of habeas corpus and granting a certificate of probable cause.[6] This appeal followed.

## II. *SCOPE OF REVIEW*

Under 28 U.S.C. § 2254(d), a state court factual finding is entitled to a "presumption of correctness" in a federal habeas corpus proceeding unless one of eight enumerated exceptions apply.[7] The first seven exceptions, which go to the procedural adequacy of the state proceedings, are not applicable to this case. The eighth exception, which we address below, applies where a factual conclusion is not adequately supported by the record as a whole.

The controlling case on the application of the eighth exception in this context is *Pat-*

---

**6.** A certificate of probable cause is required to appeal from a decision of the district court denying a writ of habeas corpus. 28 U.S.C. § 2253.

**7.** Subsection (d) reads as follows:

(d) In any proceeding instituted in a Federal court by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination after a hearing on the merits of a factual issue, made by a State court of competent jurisdiction in a proceeding to which the applicant for the writ and the State or an officer or agent thereof were parties, evidenced by a written finding, written opinion, or other reliable and adequate written indicia, shall be presumed to be correct, unless the applicant shall establish or it shall otherwise appear, or the respondent shall admit—

(1) that the merits of the factual dispute were not resolved in the State court hearing;

(2) that the factfinding procedure employed by the State court was not adequate to afford a full and fair hearing;

(3) that the material facts were not adequately developed at the State court hearing;

(4) that the State court lacked jurisdiction of the subject matter or over the person of the applicant in the State court proceeding;

(5) that the applicant was an indigent and the State court, in deprivation of his constitutional right, failed to appoint counsel to represent him in the State court proceeding;

(6) that the applicant did not receive a full, fair, and adequate hearing in the State court proceeding; or

(7) that the applicant was otherwise denied due process of law in the State court proceeding;

(8) or unless that part of the record of the State court proceeding in which the determination of such factual issue was made, pertinent to a determination of the sufficiency of the evidence to support such factual determination, is produced as provided for hereinafter, and the Federal court on a consideration of such part of the record as a whole concludes that such factual determination is not fairly supported by the record:

And in an evidentiary hearing in the proceeding in the Federal court, when due proof of such factual determination has been made, unless the existence of one or more of the circumstances respectively set forth in paragraphs numbered (1) to (7) inclusive, is shown by the applicant, otherwise appears, or is admitted by the respondent, or unless the court concludes pursuant to the provisions of paragraph numbered (8) that the record in the State court proceeding, considered as a whole, does not fairly support such factual determination, the burden shall rest upon the applicant to establish by convincing evidence that the factual determination by the State court was erroneous.

terson v. Cuyler, 729 F.2d 925 (3d Cir. 1984). *Patterson's* principal holding is that a decision of a state court concerning the voluntariness of a waiver of *Miranda* rights is entitled to the "presumption of correctness." Writing for the court, Judge Sloviter analyzed four recent Supreme Court decisions emphasizing the great deference due to state court factual findings in habeas corpus proceedings. *See Rushen v. Spain,* —— U.S. ——, 104 S.Ct. 453, 78 L.Ed.2d 267 (1983) (biased nature of jury deliberations is a finding of fact; presumption of correctness applies); *Maggio v. Fulford,* 462 U.S. 111, 103 S.Ct. 2261, 76 L.Ed.2d 794 (1983) (presumption applies to competence to stand trial); *Marshall v. Lonberger,* 459 U.S. 422, 103 S.Ct. 843, 74 L.Ed.2d 646 (1983) (presumption applies to voluntariness of a guilty plea); *Sumner v. Mata,* 455 U.S. 591, 102 S.Ct. 1303, 71 L.Ed.2d 480 (1982) (presumption applies to state of mind of witness in pre-trial photographic identification). On the basis of these cases, Judge Sloviter concluded that, contrary to our prior holdings,[8] "mixed questions of law and fact" such as whether a confession is voluntary or not are subject to the presumption of correctness contained in 28 U.S.C. § 2254(d).

▮ Neither *Patterson* nor the recent Supreme Court decisions hold that we have lost our plenary power to review questions of federal law. Instead, the Court has mandated that we treat state-court factual findings dealing with a defendant's state of mind as such, and apply the presumption of correctness, even where that finding may be dispositive as a matter of law of the defendant's claim. Section 2254(d), of course, contains exceptions, the most important of which is that the presumption does not apply unless the factual findings are fairly supported by the record. *See* 28 U.S.C. § 2254(d). Thus, as we read *Patterson* and the recent Supreme Court cases which it interprets, our review is limited to determining whether the state court applied the proper legal test, and whether the factual conclusions reached by the state court are supported on the record as a whole;[9] to the extent that our prior holdings gave us plenary review over state court findings as to state of mind, they are no longer valid.

The dissent complains bitterly that our opinion, which is, of course, informed by *Patterson,* reads recent decisions of the Supreme Court as effectively overruling, *sub silento,* fifty years of caselaw of that Court holding that the question whether a defendant's state of mind renders his confession involuntary is a question of law, over which we have plenary review in a habeas corpus case. The dissent may be correct on this point. *Patterson* is binding precedent, however, and we must apply it unless we find it distinguishable, which we do not.[10] We note that *Patterson's* reading of the trend of the recent Supreme Court decisions has since been reinforced by the Court in *Patton v. Yount,* —— U.S. ——, ——, 104 S.Ct. 2885, 2892 n. 12, 81 L.Ed.2d 847 (1984).[11] At all events, we

8. *See United States ex. rel. Hayward v. Johnson,* 508 F.2d 322 (3d Cir.), *cert. denied,* 422 U.S. 1011, 95 S.Ct. 2637, 45 L.Ed.2d 675 (1975); *United States ex rel. Rush v. Ziegele,* 474 F.2d 1356, 1358–59 (3d Cir.1973).

9. As noted above, the first seven exceptions of § 2254(d), which go to the procedural adequacy of the state proceedings, are not at issue in this case.

10. The dissent points to several "distinctions" between the voluntariness of *Miranda* waivers, the subject matter of *Patterson,* and the voluntariness of confessions, but they are distinctions without a significant difference. Although a *Miranda* waiver itself is not exculpatory, any subsequent confession is likely to be, as is evidenced by this case, and the problems of ascertaining the defendant's state of mind are likely to be identical whether the "voluntariness" challenge is to the *Miranda* waiver or to the confession itself. It is doubtless for this reason that the *Patterson* panel encompassed confessions within its holding.

To the extent that the dissent is arguing that *Patterson* was incorrectly decided, it is arguing an issue that is not before us, but that may only be decided by this Court *in banc* or by the Supreme Court. *See* Third Circuit Internal Operating Procedures Ch. VIII(c).

11. The dissent argues that *Patton* supports its position, relying on the fact that the Court in *Patton* listed a number of factors which favor

believe that *Patterson* was correctly decided and that its principles are applicable to voluntary confession cases.[12]

■ The concept of voluntariness is not one that lends itself to easy description. In determining whether a confession is voluntary, a court must make three determinations. First, the court must find the subsidiary facts on which the ultimate conclusion must be based—the circumstances surrounding the defendant's confession. Second, the court must draw an inference as to the effect that those surrounding circumstances had on the defendant's mental processes. Third, the court must determine whether the mental processes which led the defendant to confess were such that the confession was "voluntary" within the constitutional standard. *See Culombe v. Connecticut,* 367 U.S. 568, 603, 81 S.Ct. 1860, 1879, 6 L.Ed.2d 1037 (1961). The dissent does not dispute that, in reviewing a finding of voluntariness, we must defer as to the state court's findings of the subsidiary facts, such as the circumstances of the questioning and the defendant's mental capacities, as long as they are supported by the evidence. There is also no dispute that we are free to review, on a plenary basis, the legal standard applied to the "state of mind" inference drawn by the state court. The disputed question in this case is whether the inference as to the defendant's state of mind should be treated as a separate factual conclusion, to which we must also defer, or whether it is so inextricably bound up with the legal standard that the

two steps are really one, over which we have plenary review.[13]

In the long series of cases cited by the dissent, the Supreme Court confronted confessions made under varying circumstances. These cases generally presented undisputed facts, including unrecorded interrogation of the defendant by police officers, long periods of questioning during which the defendant was denied sleep, access to counsel, or any other form of outside support, and often included disputes over whether physical force was used. The Court was consistently dubious that a confession given under these circumstances could be considered "voluntary"; yet state judges and juries were finding, on the basis of these facts, that confessions were voluntary. A precise legal definition of voluntariness, however, remained elusive. As a result, the Court engaged in an independent, case-by-case review of the state courts' conclusions concerning voluntariness, on the basis of the subsidiary facts as found by the state court, and substituted its conclusion for that of the state courts.

The case which perhaps best highlights the Court's approach to this problem is one stressed by the dissent: *Culombe v. Connecticut,* 367 U.S. 568, 81 S.Ct. 1860, 6 L.Ed.2d 1037 (1961). In *Culombe,* the Court utilized the same three-stage analysis as we do here, but did not treat state court findings concerning the defendant's state of mind as binding. The court did not, however, base its holding on an unconstrained review of the state-of-mind finding. This is clear from a passage from

deference to the trial court on the issue involved in that case: juror bias. The question before us, however, is not the wisdom of section 2254(d); it is, instead, whether the question of a defendant's state of mind at the time of his confession is a question of fact, or a "mixed question of law and fact." In *Patton,* which also required the application of a legal standard to an individual's state of mind, the Court held that the question of the juror's "state of mind" was a question of fact, on which the state court was entitled to deference. A similar inquiry is present in a voluntary confession case, and section 2254(d) is similarly applicable to the inference drawn by the state court concerning the defendant's state of mind.

**12.** The extended discussion that follows is respective to the dissent. *Patterson* was a unanimous decision and there was no occasion for such comment.

**13.** The question of the degree of deference to be given by a federal court to state-court determinations of subsidiary facts in a *habeas* case is not at issue in this case. The issue, rather, is what is a "fact" for purposes of review. The distinction raised by the dissent between direct-appeal cases and *habeas corpus* cases is therefore irrelevant to this case, since the issue of which determinations are "legal" and which are "factual" is the same in both contexts.

1464

Justice Frankfurter's opinion in *Culombe* which immediately follows the segments quoted by the dissent:

> Great weight, of course, is to be accorded to the inferences which are drawn by the state courts. In a dubious case, it is appropriate with due regard to federal-state relations, that the state court's determination should control. But where on the uncontested external happenings, coercive forces set in motion by state law enforcement officials are unmistakably in action; where these forces, under all the prevailing states of stress, are powerful enough to draw forth a confession; where, in fact, the confession does come forth and is claimed by the defendant to have been extorted from him; and where he has acted as a man would act who is subjected to such an extracting process—where this is all that appears in the record—a State's judgment that the confession was voluntary cannot stand.

367 U.S. at 605, 81 S.Ct. at 1880–1881. Fairly speaking, the "inference" concerning the defendant's state of mind, therefore, was never considered a purely "legal" question; rather, it was viewed as a hybrid question, on which the state court's conclusion was entitled to some deference.[14]

In recent years, the Supreme Court has shown considerable concern for segregating "factual" and "legal" issues for purposes of appellate review. *See Pullman-Standard v. Swint,* 456 U.S. 273, 287–88, 102 S.Ct. 1781, 1789–90, 72 L.Ed.2d 66 (1982) ("ultimate" findings of fact, which are dispositive of the legal issues involved, are entitled to deference under the "clearly erroneous" standard of Fed.R.Civ.P. 52(a)).[15] The cases relied on by this court

in *Patterson* extend that concern to habeas corpus review of state court criminal convictions. *See also Patton v. Yount,* —— U.S. ——, 104 S.Ct. 2885, 81 L.Ed.2d 847 (1984). *Patterson* found this trend generally applicable to constitutional questions that turn on a determination about a defendant's state of mind, and held that such determinations were ultimate questions of fact, rather than questions of law. We read the recent decisions of the Supreme Court, as interpreted by *Patterson,* as holding that the second stage of the *Culombe* inquiry—that concerning the inference as to the defendant's state of mind— should no longer be considered a "legal" or "hybrid" question as it was in *Culombe,* but rather a question of "ultimate fact" in the sense of *Pullman-Standard v. Swint,* 456 U.S. 273, 102 S.Ct. 1781, 72 L.Ed.2d 66 (1982).

This increased concern with limiting the scope of review reflects a change of emphasis on the part of the Supreme Court. Before the Supreme Court's decision in *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), the Court had used the "voluntariness" inquiry as a way to check outrageous interrogation practices by law enforcement agencies. Since *Miranda,* however, voluntariness inquiries have played a far less important role in court supervision of police practices. Before *Miranda,* the courts were frequently presented with confessions extracted by means of the "third degree." Since *Miranda,* however, voluntary confession cases turn more often on factors such as the individual defendant's intelligence and understanding of the proceedings. In these latter cases, state court determina-

---

14. As pointed out in footnote 6 of the dissent, statements in some of the Supreme Court confession cases that the Court would not be bound by factual findings dispositive of the federal issues are "overstatements." If any of the earlier cases were dependent on such reconsiderations of factual conclusions, those cases have been overruled. *See* 28 U.S.C. § 2254(d); *Townsend v. Sain,* 372 U.S. 293, 83 S.Ct. 745, 9 L.Ed.2d 770 (1963). *Cf. Pullman-Standard v. Swint,* 456 U.S. 273, 287–88, 102 S.Ct. 1781, 1789–90, 72 L.Ed.2d 66 (1982).

15. The Court has made at least one exception, on policy grounds, to the limitation on appellate review inherent in the *Pullman-Standard* rule. *See Bose Corp. v. Consumers Union,* —— U.S. ——, 104 S.Ct. 1949, 80 L.Ed.2d 502 (1984). Judge Gibbons believes that a similar exception to § 2254(d) is implicit in the Supreme Court's treatment of the voluntary confession cases. *See* typescript at 17. We disagree. We believe that the "policies" cited by the dissent can be dealt with within the framework of the ordinary scope of review.

tion of state of mind will frequently be dispositive, if given deference by the federal courts in habeas corpus proceedings. The Supreme Court clearly understood this in its recent decisions. These cases, therefore, appear to involve a policy decision by the Court to limit the scope of federal supervision of the interrogation process, as long as the police have complied with the prophylactic rules of *Miranda*.[16]

Notwithstanding the dissent's hyperbole, the case before us today does not present the type of gross abuses of fundamental fairness that characterized many of the voluntariness cases which came before the Court in the years before its decision in *Miranda;* instead, it is typical of voluntary confession cases in the post-*Miranda* era. There was no secret interrogation in this case; indeed, the entire encounter was tape-recorded. The questioning was not pressed for a long period of time, and Miller was aware of his right to terminate it upon request. He was not denied food or other necessities, nor was he physically abused or threatened. We cannot say, and we doubt that the dissent would assert, that no confession made under the circumstances presented in this case could ever be "voluntary." Instead, we are asked to judge the effect of a particular set of circumstances on a particular defendant. This type of inquiry is one which seems to us to be peculiarly within the proper realm of the trier of fact.

We recognize that, in circumstances where the ultimate question of fact is one involving state of mind, it may be difficult to pinpoint the "factual" conclusion as to state of mind, and to state the "legal standard" in such a way as to make its application mechanistic. Under such circumstances, federal courts in habeas corpus cases must either review underlying conclusions about the defendant's state of mind as legal questions, or allow the fact-finding courts some leeway in applying legal standards to the facts of specific cases. Our reading of the recent Supreme Court decisions relied on in *Patterson* is that the Court has chosen to require strict adherence to the limited scope of review over facts, even where it would result in giving state trial courts some leeway in applying the constitutional standard.

■ Our decision does not leave the federal courts devoid of power to redress state court decisions which violate fundamental constitutional rights. The legal standard to be applied is a federal question. State courts must apply the federal constitution as it is interpreted by the federal courts, and they may not draw inferences as to a defendant's state of mind that are not supported by objective facts. But where, as here, the objective facts support a factual inference that the defendant's "state of mind" was such that the confession was voluntary within the meaning of the Constitution, it is not the role of the federal courts to second-guess the inference drawn by the state courts.

### III. *THE VOLUNTARINESS OF THE CONFESSION*

■ The constitutional test for voluntariness involves a determination, on the totality of the circumstances, whether the confession was a product of the defendant's

---

**16.** In addition, the Court's decision in *Miranda* also served to increase the awareness of constitutional rights on the part of local police officers and state court judges, thereby reducing the number of outrageous cases and the need for federal review.

The dissent misrepresents our position when it says that we hold that *Miranda* compliance affects the scope of review in a habeas case over a state-court determination about a defendant's state of mind. Our *Miranda* reference should rather be understood as an effort to explain the shift in the law. We add to this historical comment the assertion that, at the same time as

*Miranda* was taking care of the worst abuses of police authority, the Court was becoming increasingly concerned with the explosion in the workload of the federal courts, particularly the appellate courts, and with the proper allocation of functions between the state and federal courts. *E.g., Parratt v. Taylor*, 451 U.S. 527, 101 S.Ct. 1908, 68 L.Ed.2d 420 (1981). Given these developments, the Court has sought to limit the federal role to defining constitutional standards, and dictated that we defer to state courts in applying those standards where these applications are reasonable.

free will, or whether it was the product of interrogation which resulted in the overbearing of the defendant's will. *Schneckloth v. Bustamonte*, 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973). In most instances, the controlling question is the defendant's state of mind—a question of fact. In this case, the New Jersey Supreme Court[17] stated a number of subsidiary factual conclusions: that Miller was a man of reasonable intelligence who had experience with and understood the workings of the criminal justice system; that Miller's distress during the interview was a product of his realization of what he had done, not of coercive pressure by Boyce; that Miller was not deceived into believing that Boyce was anything other than a police officer investigating a serious crime for which Miller was the prime suspect; and, that Miller was well aware that, if he confessed, he would be handled through the criminal justice system. The court then concluded, on the basis of these findings, that Miller's confession was the product of his free will, rather than psychological coercion. 76 N.J. at 404, 388 A.2d at 224. Under § 2254(d), these conclusions are presumed to be correct, and we must accept them as long as they are fairly supported by the record as a whole. We find that they are.

 The most relevant part of the record in this case is the tape of Miller's interrogation and confession, and we must therefore analyze the confession tape to determine whether it supports the conclusion of the New Jersey Supreme Court. No objection is made to Boyce's confronting Miller with discrepancies in his explanation of where he was at the time of the murder, or with the statements of the victim's brothers describing the car that approached their home that morning and its driver. During the questioning, Boyce did lie in telling Miller that the victim had died only a few minutes beforehand, but this lie

does not render the confession legally involuntary unless it undermined the "voluntariness" of the confession under the totality of the circumstances. *See Frazier v. Cupp*, 394 U.S. 731, 739, 89 S.Ct. 1420, 1424, 22 L.Ed.2d 684 (1969). Since the colloquy about the time of the victim's death did not seem to affect Miller at all, it cannot be said to have undermined the voluntariness of the confession. Obviously, the fact that the interrogation was "sympathetic" rather than confrontational does not render it coercive. Similarly, to the extent that Boyce confronted Miller with the enormity of his crime, attempting to appeal to his conscience, the questioning is not objectionable, even though Boyce referred to the incident as a "problem" rather than a crime.

 Miller's principal contention is that Boyce's repeated assertions that Miller did not have "a criminal mind," and that he needed help, rather than punishment, amounted to deception or psychological coercion which undermined the voluntariness of the confession. It is axiomatic that coercion need not be physical to render the confession involuntary; any coercion which denies the defendant the freedom to remain silent may be enough. *See Garrity v. New Jersey*, 385 U.S. 493, 496, 87 S.Ct. 616, 618, 17 L.Ed.2d 562 (1967). Psychological coercion is enough if, under the totality of the circumstances, it results in the overbearing of the defendant's will. All police practices that encourage defendants to confess, however, do not amount to psychological coercion. Our role is to review the nature of the questioning involved, accepting as true those findings of the state court that involve the defendant's state of mind, to determine whether the tactics used by Detective Boyce in this case were unconstitutionally coercive.

---

17. The fact that the facts found in this case are taken from the opinion of the New Jersey Supreme Court, rather than from a statement of findings by the trial court, does not vitiate the presumption of correctness. *See Time, Inc. v. Firestone*, 424 U.S. 448, 461, 96 S.Ct. 958, 968, 47

L.Ed.2d 154 (1976); *Hance v. Zant*, 696 F.2d 940, 946 (11th Cir.), *cert. denied*, —— U.S. ——, 103 S.Ct. 3544, 77 L.Ed.2d 1393 (1983); *United States ex rel. Heral v. Franzen*, 667 F.2d 633 (7th Cir.1981).

■ The most substantial potential problem with the confession is that Boyce's questioning arguably implied that Miller would receive "help," not punishment, if he confessed.[18] The use of promises by an interrogating officer can be sufficient to invalidate a confession. *See Robinson v. Smith*, 451 F.Supp. 1278, 1290 (W.D.N.Y. 1978), and cases cited therein. In general, however, promises by interrogators will not invalidate a confession unless they are sufficient to "overbear the defendant's will"—the general standard of voluntariness. *See Fernandez-Delgado v. United States*, 368 F.2d 34 (9th Cir.1966) (where defendant was told that any assistance to investigators would be brought to the attention of prosecutors, confession was not rendered inadmissible as a result); *United States v. Ferrara*, 377 F.2d 16 (2d Cir.), *cert. denied*, 389 U.S. 908, 88 S.Ct. 225, 19 L.Ed.2d 225 (1967) (where interrogator told defendant that if he cooperated with the government, he would be released on a reduced bail, the confession was not rendered involuntary); *United States v. Glasgow*, 451 F.2d 557 (9th Cir.1971) (per curiam) (where interrogator told defendant he would inform prosecutor if defendant cooperated, the confession was not necessarily rendered involuntary).[19]

18. Boyce never explicitly promised to do anything other than "do all I can with the psychiatrist and everything ..." In context, this statement apparently refers to a discussion, moments earlier, of the lack of proper psychiatric treatment under Miller's parole for a prior crime.

19. Appellant relies on the venerable case of *Bram v. United States*, 168 U.S. 532, 542–43, 18 S.Ct. 183, 186–87, 42 L.Ed. 568 (1897), in which the court stated that a confession is involuntary if "obtained by any direct or implied promise, however slight." As the Second Circuit has stated, "[t]hat language has never been applied with the wooden literalness urged upon us by appellant." *United States v. Ferrara*, 377 F.2d 16, 17 (2d Cir.1967).

20. For instance, at page 12 of the typescript, Boyce said:

B: Frank, listen to me, honest to God, I'm, I'm telling you, Frank, (inaudible). I know, it's going to bother you, Frank, it's going to bother you. It's there, it's not going to go away,

■ In this case, Miller showed a continuing recognition of the depth of the trouble that he was in and the consequences of telling Boyce the truth. Although Boyce stated that he felt Miller needed help, not imprisonment, this was only part of his approach. He also spoke to Miller about the need to tell the truth to purge his conscience,[20] and continually intermixed his statements about Miller's "problem" with his appeals to conscience. The state court found that this questioning did not overbear Miller's will, and thus did not render the confession involuntary. As we have noted above, we conclude that the state court's determination as to the effect on Miller's state of mind was supported on the record as a whole.

## IV. CONCLUSION

Under the caselaw on the question of voluntariness, the inquiry before us is whether the confession was "a product of an essentially free and unconstrained choice by its maker." Judging by this standard, in light of our restricted scope of review, we have concluded that Miller's confession was voluntary and hence admissible.[21] The judgment of the district court will be affirmed.

it's there. It's right in front of you, Frank. Am I right or wrong?
M: Yeah.

21. Even if our review on this question was plenary, we would reach the same result. We essentially agree with the conclusions of the New Jersey Supreme Court concerning the effect of Boyce's questioning of Miller. *See supra* typescript at 9–10. We also agree that Boyce's questioning technique could, under different circumstances, create risks of deception. The same questioning coming from, for example, a psychiatrist employed by the police but not clearly identified as a detective, might well create a situation in which the confession would not be voluntary. *See Leyra v. Denno*, 347 U.S. 556, 74 S.Ct. 716, 98 L.Ed. 948 (1954) (confession made to a psychiatrist, following three days of prior questioning by police, where psychiatrist was not identified as a police interrogator, was not voluntary). Similarly, if Boyce's questioning had in fact induced Miller to confess in the belief that he would receive psychological "help" rather than punishment, the confession would not be "voluntary."

GIBBONS, Circuit Judge, dissenting.

This is a tragic case, made so by the grim death of a young woman, by the abrasive, debilitating psychological ploys used to extract a confession of her murder, and by this court's refusal to follow more than fifty Supreme Court precedents holding that the question whether a confession is involuntarily given is a mixed question of law and fact, over which our review of the ultimate question of voluntariness is for error of law. The majority's holding places us in conflict with eight Federal Circuits. Our decision is all the more disconcerting because, as a matter of law, the confession of the defendant, Frank Miller, was involuntarily obtained. By reclassifying the issue as one of "fact" and deferring to the "factual" findings of the state courts— findings those courts neither made nor purported to make—the majority has abdicated its judicial responsibility to make an independent determination of the voluntariness of a confession. And as a crowning irony to this court's decision, a majority of the eleven New Jersey judges who reviewed this confession, and to whom we are deferring, concluded not that it was voluntary but that it was involuntary; and all eleven judges asserted that they were drawing a legal conclusion. I emphatically dissent.

## I.

The confession at issue here was the product of implied promises, trickery, cajolery, dissembling, and exaggeration. Because a complete transcript and tape recording of the interrogation are in the record, none of the historical facts concerning Miller's confession are in dispute. The majority's abridged account of Detective Boyce's questioning conveys neither the deceit employed nor the intensity of the interrogation.

Early in the interrogation Detective Boyce led Miller to believe that Miller had been identified at the scene of the crime. "[W]e have a physical description," Boyce asserted, that "fits you and the clothes you

were wearing." App. at 7. Later Boyce told Miller, "[Y]ou were identified as being there talking to her minutes before she was ... [murdered]." App. at 9. In fact Boyce had no such identification. The witness, Daniel Margolin, testified:

> I didn't pay very much attention to the person [driving the car] because I assumed it was someone in the neighborhood and all I really noticed about the individual was he looked about average, he looked like a factory worker and that he had loose-fitting clothing on.

Tr. at 169–70. No identification of Miller was ever introduced at trial. Nevertheless, unaware of Boyce's misrepresentation during the interrogation, Miller responded, "[L]ike you say, I'm identified and my car's identified." App. at 8.

Boyce also represented that blood stains of Deborah Margolin, the victim, were found on Miller's doorstep. "We went to your house last night and found blood stains on the front stoop," Boyce dissembled. App. at 6. In fact the state introduced no such evidence at trial and does not contend on appeal that any such blood existed.

Nor did the interrogation stop with these fabrications. Miller had been detained in the Flemington State Police Barracks kitchen for two hours before his interrogation. In pretrial proceedings Miller testified that during this detention, Officer Scott "told me that a girl had been cut but that she was lucky she was still alive and was going to be able to identify the guy that done it." Tr. at 109. Scott's assertion was false; although both officers knew that Margolin had died five hours earlier, they deliberately left the impression that she had given a description and could identify her assailant. Alluding to Scott's remark that Margolin "was in the hospital," App. at 9, Miller asked his interrogator whether Margolin was still alive. App. at 8. Boyce quickly ad-libbed, "She died just a few minutes ago. I just got ... that's what that [telephone] call was about."[1] App. at 9. In fact

---

1. The tape recording of the interrogation reveals that a telephone rang shortly before Miller

Margolin had died hours earlier leaving no description of her assailant.

These prevarications were followed by thirty-eight minutes of intensive, relentless questioning during which Boyce plainly and simply overbore the defendant's will. Boyce badgered Miller incessantly with promises of help if Miller would confess. On no less than 41 occasions Boyce urged that Miller admit he had a problem, that he needed help to solve his problem, and that Boyce would provide that help if Miller would confess. App. at 6–17 *passim.* "If I promise to, you know, do all I can with the psychiatrist and everything, and we get the proper help for you, ... will you talk to me about it?" whispered Boyce. App. at 12. "[W]e're going to see to it that you get the proper help. This is our job, Frank. This is our job. This is what I want to do," Boyce intoned. App. at 15. On at least 12 other occasions Boyce urged that Miller would not be held responsible for his actions. "[I]t's not your fault, it's their fault," said Boyce. App. at 11. "[I]f you did commit an act, actually they're the ones that are to blame, in my eyes, ... not you as an individual." *Id.* "[I]t may have been an accident," Boyce entreated. "It may be something that, that you did that you can't be held accountable for." App. at 15. The tape reveals Miller sobbing thirty minutes into the interrogation, distraught, weak, and unstable.

As if there could be any doubt about the intensity of this debilitating examination, at the conclusion of Boyce's interrogation Miller lapsed into unconsciousness. The majority glosses over the fact that Miller passed out on the floor at the end of the questioning as though this were the ordinary response of one in control of his will

during an interrogation. In fact Miller's unconscious state prevented the officers from obtaining any signed confession. Detective Boyce testified:

Q. I gather that [a] statement was never taken, is that right?

A. It was not.

Q. Why was that, Officer?

A. Momentarily after terminating this particular interview Mr. Miller went into as I can best define it a state of shock.

Q. What do you mean by that, sir?

A. He was sitting on a chair—...

Mr. Miller had been sitting on a chair, had slid off of the chair on to the floor maintaining a blank stare on his face, staring straight ahead and we were unable to get any type of verbal response from him at that time.

Q. As I understand it he was then removed to the Hunterton Medical Center, is that right?

A. Yes, the first aid squad was contacted immediately.

Tr. at 84–85.

In a unanimous, strongly worded opinion, the New Jersey Appellate Division condemned these adjurations as "relentless and successful Svengalian efforts." *State v. Miller,* 76 N.J. 392, 419, 388 A.2d 218, 232 (1978) (Conford, P.J.A.D., dissenting).[2] Without dissent the court held that Miller "could not long resist the tremendous psychological pressure." *Id.* "The tape transcript must be read in its entirety for its full aroma to be savored," that court observed. *Id.* at 413, 388 A.2d at 229. Miller's ultimate confession, the court held, was a "capitulation to the superior mind."

---

asked whether Margolin had died. Boyce quickly fabricated a story that the caller informed him that Margolin had died moments earlier.

In pretrial testimony Scott asserted that he did not "discuss any aspect of the murder of Miss Deborah Margolin" in the Barracks kitchen. Tr. at 58. In light of Miller's contemporary allusion on the tape to Scott's remark that Margolin "was in the hospital," this testimony was not credible. The trial court found only that Miller "was not interrogated" during this period.

Tr. at 145, a finding not inconsistent with the fact that Scott remarked to Miller that Margolin was in the hospital when the interrogation began. *See Rhode Island v. Innis,* 446 U.S. 291, 299–303, 100 S.Ct. 1682, 1688–91, 64 L.Ed.2d 297 (1980).

**2.** The opinion of the Appellate Division is reproduced in substantial part in Judge Conford's dissent, to which the citations in this opinion refer.

*Id.* at 422, 388 A.2d at 234. And capitulation it was. Miller was tricked by an intensive, hypnotic 58-minute interrogation into incriminating himself by a superior questioner who played on Miller's unstable, childlike mind.

## II.

After reviewing these events, the New Jersey Appellate Division held:

> An overbearing broadside which results in a confession by virtue of intense and mind bending psychological compulsion deserves no better fate at our hands than does the legendary rubber hose. *Chambers v. Florida,* 309 U.S. 227 [60 S.Ct. 472, 84 L.Ed. 716] (1940). We have long cherished a determination that the fair winds of due process shall blow upon the guilty as well as the innocent. We will not here let our gratitude for good police work which ferreted out one who is most probably a murderer, and our abhorrence

at the crime he committed, cause us to abandon basic constitutional principles. 76 N.J. at 422–23, 388 A.2d at 234. Without applying these constitutional principles, indeed without referring to them, the majority today characterizes the voluntariness of Miller's confession as a question of "fact." The "factual" finding of the New Jersey Supreme Court, the majority concludes—a finding that court never made, for the New Jersey Supreme Court held that it was deciding a question of law—is not without support in the record. Consequently, the majority reasons, we must defer to the state courts' "finding" that Miller's confession was voluntary.

This disposition is squarely in conflict with Supreme Court precedent. Over fifty Supreme Court decisions have held that the voluntariness of a confession is a mixed question of law and fact over which our review of the ultimate question of voluntariness is plenary.[3] Indeed, no issue has

---

3. The Supreme Court has reversed convictions predicated on confessions held involuntary as a matter of law on 31 occasions. *Brown v. Mississippi,* 297 U.S. 278, 56 S.Ct. 461, 80 L.Ed. 682 (1936); *Chambers v. Florida,* 309 U.S. 227, 60 S.Ct. 472, 84 L.Ed. 716 (1940); *Canty v. Alabama,* 309 U.S. 629, 60 S.Ct. 612, 84 L.Ed. 988 (1940) (per curiam) (summary reversal on authority of *Chambers*); *White v. Texas,* 310 U.S. 530, 60 S.Ct. 1032, 84 L.Ed. 1342 (1940) (on petition for rehearing after summary reversal); *Lomax v. Texas,* 313 U.S. 544, 61 S.Ct. 956, 85 L.Ed. 1511 (1941) (per curiam) (summary reversal on authority of *Chambers* and *White*); *Vernon v. Alabama,* 313 U.S. 547, 61 S.Ct. 1092, 85 L.Ed. 1513 (1941) (per curiam) (same); *Ward v. Texas,* 316 U.S. 547, 62 S.Ct. 1139, 86 L.Ed. 1663 (1942); *Ashcraft v. Tennessee,* 322 U.S. 143, 64 S.Ct. 921, 88 L.Ed. 1192 (1944); *Malinski v. New York,* 324 U.S. 401, 65 S.Ct. 781, 89 L.Ed. 1029 (1945); *Haley v. Ohio,* 332 U.S. 596, 68 S.Ct. 302, 92 L.Ed. 224 (1948); *Watts v. Indiana,* 338 U.S. 49, 69 S.Ct. 1347, 93 L.Ed. 1801 (1949); *Turner v. Pennsylvania,* 338 U.S. 62, 69 S.Ct. 1352, 93 L.Ed. 18 (1949); *Harris v. South Carolina,* 338 U.S. 68, 69 S.Ct. 1354, 93 L.Ed. 1815 (1949); *Johnson v. Pennsylvania,* 340 U.S. 881, 71 S.Ct. 191, 95 L.Ed. 640 (1950) (per curiam) (summary reversal on authority of *Turner*); *Leyra v. Denno,* 347 U.S. 556, 74 S.Ct. 716, 98 L.Ed. 948 (1954); *Fikes v. Alabama,* 352 U.S. 191, 77 S.Ct. 281, 1 L.Ed.2d 246 (1957); *Payne v. Arkansas,* 356 U.S. 560, 78 S.Ct. 844, 2 L.Ed.2d 975 (1958); *Spano v. New York,* 360 U.S. 315, 79 S.Ct. 1202, 3 L.Ed.2d 1265 (1959); *Blackburn v. Alabama,* 361 U.S. 199, 80 S.Ct. 274, 4 L.Ed.2d 242 (1960);

*Reck v. Pate,* 367 U.S. 433, 81 S.Ct. 1541, 6 L.Ed.2d 948 (1961); *Culombe v. Connecticut,* 367 U.S. 568, 81 S.Ct. 1860, 6 L.Ed.2d 1037 (1961); *Gallegos v. Colorado,* 370 U.S. 49, 82 S.Ct. 1209, 8 L.Ed.2d 325 (1962); *Lynumn v. Illinois,* 372 U.S. 528, 83 S.Ct. 917, 9 L.Ed.2d 922 (1963); *Haynes v. Washington,* 373 U.S. 503, 83 S.Ct. 1336, 10 L.Ed.2d 513 (1963); *Davis v. North Carolina,* 384 U.S. 737, 86 S.Ct. 1761, 16 L.Ed.2d 895 (1966); *Garrity v. New Jersey,* 385 U.S. 493, 87 S.Ct. 616, 17 L.Ed.2d 562 (1967); *Clewis v. Texas,* 386 U.S. 707, 87 S.Ct. 1338, 18 L.Ed.2d 423 (1967); *Beecher v. Alabama,* 389 U.S. 35, 88 S.Ct. 189, 19 L.Ed.2d 35 (1967) (per curiam); *Greenwald v. Wisconsin,* 390 U.S. 519, 88 S.Ct. 1152, 20 L.Ed.2d 77 (1968) (per curiam); *Darwin v. Connecticut,* 391 U.S. 346, 88 S.Ct. 1488, 20 L.Ed.2d 630 (1968) (per curiam); *Mincey v. Arizona,* 437 U.S. 385, 98 S.Ct. 2408, 57 L.Ed.2d 290 (1978).

The Court has sustained convictions predicated on confessions held voluntary as a matter of law on 14 occasions. *Lisenba v. California,* 314 U.S. 219, 62 S.Ct. 280, 86 L.Ed. 166 (1941); *Lyons v. Oklahoma,* 322 U.S. 596, 64 S.Ct. 1208, 88 L.Ed. 1481 (1944); *Gallegos v. Nebraska,* 342 U.S. 55, 72 S.Ct. 141, 96 L.Ed. 86 (1951); *Stroble v. California,* 343 U.S. 181, 72 S.Ct. 599, 96 L.Ed. 872 (1952); *Brown v. Allen,* 344 U.S. 443, 73 S.Ct. 397, 97 L.Ed. 469 (1953); *Stein v. New York,* 346 U.S. 156, 73 S.Ct. 1077, 97 L.Ed. 1522 (1953); *Thomas v. Arizona,* 356 U.S. 390, 78 S.Ct. 885, 2 L.Ed.2d 863 (1958); *Ashdown v. Utah,* 357 U.S. 426, 78 S.Ct. 1354, 2 L.Ed.2d 1443 (1958); *Crooker v. California,* 357 U.S. 433, 78

consumed the attention of the Supreme Court more completely in this century, no single question has been investigated more thoroughly nor dissected more vigorously, than the standards for the voluntariness of a confession. The most recent of these decisions, decided barely a month after the New Jersey Supreme Court's decision in this case, reiterated what has become rote in the Court's jurisprudence: a confession is voluntary only if it is " ' "the product of a rational intellect and a free will," ' " and "[i]n making this determination, we are not bound by the [state] [s]upreme [c]ourt's holding that the statements were voluntary. Instead, this Court is under a duty to make an independent evaluation of the record." *Mincey v. Arizona,* 437 U.S. 385, 398, 98 S.Ct. 2408, 2416, 57 L.Ed.2d 290 (1978).

The authority for the majority's decision to ignore 48 years of Supreme Court precedent holding that the ultimate issue of voluntariness of a confession is a question of law is the panel opinion of this court in *Patterson v. Cuyler,* 729 F.2d 925 (3d Cir.

1984). Creating a conflict with eight Federal Circuits, *see* note 20 *infra, Patterson* reasoned that the voluntariness of a confession is an issue of historical fact.[4] In so reasoning, the Patterson court concluded that no less than fifty Supreme Court decisions have been overruled *sub silentio,* a *coup muet* said to be the work of three recent decisions of the Supreme Court.[5] None of the recent opinions examined in *Patterson* addresses the voluntariness of a confession. The *Patterson* court mentioned none of the fifty confession cases which it reasoned were overruled *sub silentio*; nor did it discuss the motive and purpose behind the Supreme Court's classification of voluntariness of a confession as a mixed question of law and fact. Indeed, *Patterson* itself addresses only the voluntariness of a *Miranda* waiver. No petition for rehearing in *Patterson* was filed.

I dissent from the majority's roughshod treatment of almost half a century of Supreme Court precedent. The history of the voluntary-confession doctrine makes it

S.Ct. 1287, 2 L.Ed.2d 1448 (1958); *Cicenia v. Lagay,* 357 U.S. 504, 78 S.Ct. 1297, 2 L.Ed.2d 1523 (1958); *Boulden v. Holman,* 394 U.S. 478, 89 S.Ct. 1138, 22 L.Ed.2d 433 (1969); *Frazier v. Cupp,* 394 U.S. 731, 89 S.Ct. 1420, 22 L.Ed.2d 684 (1969); *Procunier v. Atchley,* 400 U.S. 446, 91 S.Ct. 485, 27 L.Ed.2d 524 (1971); *Hutto v. Ross,* 429 U.S. 28, 97 S.Ct. 202, 50 L.Ed.2d 194 (1976) (per curiam).

In addition, the Supreme Court has addressed several procedural issues pertaining to the determination of voluntariness. In these instances the Court reaffirmed that the ultimate issue of voluntariness of a confession is one of law and remanded for further proceedings. *See Lee v. Mississippi,* 332 U.S. 742, 743–46, 68 S.Ct. 300, 300–02, 92 L.Ed. 330 (1948) (defendant's denial that confession was made does not estop assertion that it was involuntary); *Rogers v. Richmond,* 365 U.S. 534, 540–49, 81 S.Ct. 735, 739–44, 5 L.Ed.2d 760 (1961) (impermissible to rely on reliability of confession as evidence of voluntariness); *Townsend v. Sain,* 372 U.S. 293, 307–09, 83 S.Ct. 745, 754–55, 9 L.Ed.2d 770 (1963) (circumstances under which evidentiary hearing must be held in habeas corpus proceedings); *Jackson v. Denno,* 378 U.S. 368, 376–91, 84 S.Ct. 1774, 1780–89, 12 L.Ed.2d 908 (1964) (trial court must make initial determination of voluntariness before submission to jury); *Boles v. Stevenson,* 379 U.S. 43, 44–46, 85 S.Ct. 174, 175–76, 13 L.Ed.2d 109 (1964) (per curiam) (same as *Jack-*

*son*); *Sims v. Georgia,* 385 U.S. 538, 541–44, 87 S.Ct. 639, 641–43, 17 L.Ed.2d 593 (1967) (same; trial court's conclusion of voluntariness "must appear from the record with unmistakable clarity"); *Lego v. Twomey,* 404 U.S. 477, 482–89, 92 S.Ct. 619, 623–27, 30 L.Ed.2d 618 (1972) (voluntariness in *Jackson v. Denno* hearing need be established only by preponderance of evidence).

4. Language in *Patterson* might be read to hold that voluntariness of a confession is a mixed question of law and fact, and that such mixed questions are subject to the presumption of correctness of 28 U.S.C. § 2254(d) (1982). 729 F.2d at 932. This conclusion, however, is contradicted by the Supreme Court's recent decision in *Strickland v. Washington,* —— U.S. ——, 104 S.Ct. 2052, 2070, 80 L.Ed.2d 674 (1984). Thus, I read *Patterson* to hold that the voluntariness of a confession is itself an issue of historical fact.

5. *Rushen v. Spain,* —— U.S. ——, 104 S.Ct. 453, 456, 78 L.Ed.2d 267 (1983) (per curiam) (jury bias a question of fact); *Maggio v. Fulford,* —— U.S. ——, 103 S.Ct. 2261, 2262–64, 76 L.Ed.2d 794 (1983) (per curiam) (competence to stand trial a question of fact); *Marshall v. Lonberger,* 459 U.S. 422, 103 S.Ct. 843, 849, 74 L.Ed.2d 646 (1983) (ultimate question of voluntariness of guilty plea an issue of law). *Rushen* and *Maggio* were per curiam summary reversals decided without briefing or argument.

abundantly clear that the ultimate issue of voluntariness of a confession is a question of law. *See* Part III *infra*. Moreover, I dissent from the majority's deference to a finding of "fact" that no New Jersey Court has made. There is no authority for deference to a finding of "fact" when the court rendering such a "finding" has expressly held that it is not making a factual finding but drawing a legal conclusion. *See* Part IV *infra*. We pay little respect for the state courts by ignoring their holdings and rewriting their factual findings. Finally, I dissent from the majority's suggestion that three recent Supreme Court decisions have overruled *sub silentio* one of the most firmly grounded of Supreme Court doctrines. One of these decisions, holding that the ultimate issue of voluntariness of a guilty plea is a question of law, undermines the majority's position. Neither of the remaining decisions pertains to custodial interrogation conducted in closed proceedings. The import and force of the voluntary-confession doctrine, in contrast, is to afford independent federal review over these closed proceedings. *See* Part III D *infra*. The majority's decision today raises deeply disturbing questions concerning respect for *stare decisis* and regarding the appropriate role of the inferior federal courts in our hierarchical legal structure.

### III.

### *Ultimate Issue of Voluntariness of a Confession is a Question of Law*

#### A. The Direct-Appeal Doctrine

The Supreme Court held in 1936 that a conviction obtained by means of a confession extracted by violence violates due process of law. *Brown v. Mississippi*, 297 U.S. 278, 286, 56 S.Ct. 461, 465, 80 L.Ed. 682 (1936). The interrogators in *Brown* brazenly admitted their torture. " 'This deputy was put on the stand by the state in rebuttal, and admitted the whippings,' " noted Chief Justice Hughes. Asked how severely one of the defendants was whipped, the deputy testified, " ' "Not too much for a negro; not as much as I would have done if it were left to me." ' " *Id.* at

284, 56 S.Ct. at 464. Two others who had participated in the whippings " 'were introduced and admitted it,' " the Court observed; " 'not a single witness was introduced who denied it.' " *Id.* at 284–85, 56 S.Ct. at 464–65. Thus no conflict in the trial testimony was presented in *Brown*. The Supreme Court held that on the basis of the facts admitted, "It would be difficult to conceive of methods more revolting to the sense of justice than those taken to procure the confessions of these petitioners, and the use of the confessions thus obtained as a basis for conviction and sentence was a clear denial of due process." *Id.* at 286, 56 S.Ct. at 465.

On the Supreme Court's next occasion to address a coerced-confession claim, the interrogators were neither as brazen nor as foolish as those in *Brown*, for none admitted to mistreatment of the defendants. In *Chambers v. Florida*, 309 U.S. 227, 60 S.Ct. 472, 84 L.Ed. 716 (1940), the Florida Supreme Court had twice reversed the convictions of four defendants, directing that a jury decide in *coram nobis* proceedings whether their confessions were " 'in fact freely and voluntarily made.' " *Id.* at 227–28 n. 2, 60 S.Ct. at 473 n. 2. After a jury twice found the confessions voluntary, Florida's highest court affirmed. The evidence of voluntariness before the Supreme Court consisted of the transcripts of these *coram nobis* proceedings. "The testimony [in these proceedings] is in conflict," noted Justice Black, "as to whether all four petitioners were continually threatened and physically mistreated until they finally, in hopeless desperation and fear of their lives, agreed to confess ...." *Id.* at 231, 60 S.Ct. at 474.

Before the Supreme Court the State of Florida urged that the jury's finding of voluntariness was a finding of "fact." This "finding," Florida argued, resolved any dispute in the testimony as to voluntariness and "finally determined [that issue] because passed upon by a jury." *Id.* at 228, 60 S.Ct. at 473. The Supreme Court rejected this claim. "[W]e must determine independently," the Court held, "whether

petitioners' confessions were so obtained, by review of the facts upon which that issue necessarily turns." *Id.* at 229, 60 S.Ct. at 473 (footnote omitted). Because certain of the historical facts were disputed, the Court held, it would decide the voluntariness of the confessions as a matter of law on the basis of the undisputed historical facts. *Id.* at 238–39, 60 S.Ct. at 477–78.

*Chambers v. Florida* thereby became the progenitor of the Supreme Court's direct-appeal doctrine in voluntary-confession cases. That doctrine provides that in reviewing claims of coerced confession raised on direct appeal to the Supreme Court, the voluntariness of the confession is to be decided as a matter of law on the basis of the admitted or undisputed historical facts of record. The Court applied the direct-appeal doctrine without fail in seventeen voluntary confession cases decided after the *Chambers* decision in 1940 and before the first voluntary-confession claim to reach the Supreme Court by habeas corpus, *Brown v. Allen,* 344 U.S. 443, 73 S.Ct. 397, 97 L.Ed. 469 (1953), in 1953.[6] The Court's 1949 trilogy of confession cases, *Watts v. Indiana,* 338 U.S. 49, 69 S.Ct. 1347, 93 L.Ed. 1801 (1949); *Turner v. Pennsylvania,* 338 U.S. 62, 69 S.Ct. 1352, 93 L.Ed. 1810 (1949); *Harris v. South Carolina,* 338 U.S. 68, 69 S.Ct. 1354, 93 L.Ed. 1815 (1949), state the doctrine clearly:

> On review here of State convictions, all those matters which are usually termed issues of fact are for conclusive determination by the State courts and are not open for reconsideration by this Court. Observance of this restriction in our re-

view of State courts calls for the utmost scruple. But "issue of fact" is a coat of many colors. It does not cover a conclusion drawn from uncontroverted happenings, when that conclusion incorporates standards of conduct or criteria for judgment which in themselves are decisive of constitutional rights. Such standards and criteria, measured against the requirements drawn from constitutional provisions, and their proper applications, are issues for this Court's adjudication.... Especially in cases arising under the Due Process Clause is it important to distinguish between issues of fact that are here foreclosed and issues which, though cast in the form of determinations of fact, are the very issues to review which this Court sits....

> ...[I]n all the cases that have come here...during the last decade from the courts of the various States in which it was claimed that the admission of coerced confessions vitiated convictions for murder [citing fourteen cases], there has been complete agreement that any conflict in testimony as to what actually led to a contested confession is not this Court's concern. Such conflict comes here authoritatively resolved by the State's adjudication. Therefore only those elements of the events and circumstances in which a confession was involved that are unquestioned in the State's version of what happened are relevant to the constitutional issue here. *But if force has been applied, this Court does not leave to local determination whether or not the confession was voluntary.* There is torture of mind

**6.** *Canty v. Alabama,* 309 U.S. 629, 60 S.Ct. 612, 84 L.Ed. 988 (1940) (per curiam); *White v. Texas,* 310 U.S. 530, 60 S.Ct. 1032, 84 L.Ed. 1342 (1940); *Lomax v. Texas,* 313 U.S. 544, 61 S.Ct. 956, 85 L.Ed. 1511 (1941) (per curiam); *Vernon v. Alabama,* 313 U.S. 547, 61 S.Ct. 1092, 85 L.Ed. 1513 (1941) (per curiam); *Lisenba v. California,* 314 U.S. 219, 62 S.Ct. 280, 86 L.Ed. 166 (1941); *Ward v. Texas,* 316 U.S. 547, 62 S.Ct. 1139, 86 L.Ed. 1663 (1942); *Ashcraft v. Tennessee,* 322 U.S. 143, 64 S.Ct. 921, 88 L.Ed. 1192 (1944); *Lyons v. Oklahoma,* 322 U.S. 596, 64 S.Ct. 1208, 88 L.Ed. 1481 (1944); *Malinski v. New York,* 324 U.S. 401, 65 S.Ct. 781, 89 L.Ed. 1029 (1945);

*Haley v. Ohio,* 332 U.S. 596, 68 S.Ct. 302, 92 L.Ed. 224 (1948); *Lee v. Mississippi,* 332 U.S. 742, 68 S.Ct. 300, 92 L.Ed. 330 (1948); *Watts v. Indiana,* 338 U.S. 49, 69 S.Ct. 1347, 93 L.Ed. 1801 (1949); *Turner v. Pennsylvania,* 338 U.S. 62, 69 S.Ct. 1352, 93 L.Ed. 1810 (1949); *Harris v. South Carolina,* 338 U.S. 68, 69 S.Ct. 1354, 93 L.Ed. 1815 (1949); *Johnson v. Pennsylvania,* 340 U.S. 881, 71 S.Ct. 191, 95 L.Ed. 640 (1950) (per curiam); *Gallegos v. Nebraska,* 342 U.S. 55, 72 S.Ct. 141, 96 L.Ed. 86 (1951); *Stroble v. California,* 343 U.S. 181, 72 S.Ct. 599, 96 L.Ed. 872 (1952).

as well as body; the will is as much affected by fear as by force. And there comes a point where this Court should not be ignorant as judges of what we know as men.

*Watts v. Indiana,* 338 U.S. at 50–52, 69 S.Ct. at 1348–49 (opinion of Frankfurter, J.) (emphasis added) (footnote and citations omitted).

Indeed, the direct-appeal doctrine became so firmly rooted in Supreme Court jurisprudence that reiteration of the oft-repeated standard became second nature to the Court. Thus, after putting "to one side the controverted evidence" in *Haley v. Ohio,* 332 U.S. 596, 597–98, 68 S.Ct. 302, 302–03, 92 L.Ed. 224 (1948), and noting that both the state trial court and the jury "found" the defendant's confession voluntarily made, *id.* at 599, 68 S.Ct. at 303, the Supreme Court held:

> But the ruling of the trial court and the finding of the jury on the voluntary character of the confession do not foreclose the independent examination which it is our duty to make here.... If the undisputed evidence suggests that force or coercion was used to exact the confession, we will not permit the judgment of conviction to stand....

*Id.* (opinion of Douglas, J.). Similarly, in *Gallegos v. Nebraska,* 342 U.S. 55, 72 S.Ct. 141, 96 L.Ed. 86 (1951), the Court held:

> As this Court has been entrusted with power to interpret and apply our Constitution to the protection of the right of an accused to federal due process in state criminal trials, the proper performance of that duty requires us to examine, in cases before us, such undisputed facts as form the basis of a state court's denial of that right.... A contrary rule would deny to the Federal Government ultimate authority to redress a violation of constitutional rights. As state courts also are charged with applying constitutional standards of due process, in recognition of their superior opportunity to appraise conflicting testimony, we give deference

to their conclusions on disputed and essential issues of what actually happened.... Its duty compels this Court, however, to decide for itself, on the facts that are undisputed, the constitutional validity of a judgment that denies claimed constitutional rights.

342 U.S. at 61, 72 S.Ct. at 145 (opinion of Reed, J.).

The Supreme Court's decision to characterize the ultimate issue of voluntariness of a confession as one of law did not turn on an epistemological theory of whether "voluntariness" concerned the defendant's "state of mind" and whether such "state of mind" issues are questions of "fact." To the contrary, the Court's holdings had a far deeper motivation. The interrogations at issue took place in secret. They generally occurred in inherently coercive settings, frequently involving a single defendant shackled or detained for long periods of time and surrounded or confronted by relays of five or more police officers. At trial the defendant's account was matched against the testimony of many officers, some of it obviously incredulous to the Supreme Court. The Court construed the ultimate question of voluntariness as one of law because the settings of police interrogations were secret and inherently coercive, because the Court had grave doubts about what transpired during these secret proceedings, and because federal review of these proceedings would be frustrated on direct appeal if the question were one of fact. Hence the Court's explanation in both *Haynes v. Washington,* 373 U.S. 503, 515–16, 83 S.Ct. 1336, 1344–45, 10 L.Ed.2d 513 (1963), and *Stein v. New York,* 346 U.S. 156, 181, 73 S.Ct. 1077, 1091, 97 L.Ed. 1522 (1953)—both coerced-confession cases—that "this Court cannot allow itself to be completely bound by state court determination of any issue essential to decision of a claim of federal right, else federal law could be frustrated by distorted fact finding." [7]

7. *See also Irvin v. Dowd,* 366 U.S. 717, 723, 81 S.Ct. 1639, 1642, 6 L.Ed.2d 751 (1961) (competence of juror to set aside preconceived view of defendant's guilt a mixed question of law and

The Supreme Court's opinions in *White v. Texas*, 310 U.S. 530, 60 S.Ct. 1032, 84 L.Ed. 1342 (1940), and *Ward v. Texas*, 316 U.S. 547, 62 S.Ct. 1139, 86 L.Ed. 1663 (1942), are exemplars of this point. State officers in both cases conceded that they had taken the defendant on "night trips to the woods," "out off of the road," *White*, 310 U.S. at 533, 60 S.Ct. at 1033, or "by night and day to strange towns," *Ward*, 316 U.S. at 555, 62 S.Ct. at 1143. They contested, however, what happened on these strange "night trips." The defendants contended that they were "beaten, whipped and burned," *Ward*, 316 U.S. at 551, 62 S.Ct. at 1141, "handcuffed" and "whipped," *White*, 310 U.S. at 532, 60 S.Ct. at 1033, and otherwise subject to physical abuse. The interrogating officers, in contrast, denied any mistreatment, avowing instead that the defendants felt a new sense of peace after these night journeys and willingly confessed. The officer's testimony in *Ward v. Texas* is illustrative: " 'We just talked to him to get that statement. Yes, sir, we just sweet talked him out of it.' " 316 U.S. at 552, 62 S.Ct. at 1142. The Texas courts resolved the disputed testimony in favor of the officers and purported to "find" the confessions voluntary. In order to prevent gross miscarriages of justice, the Supreme Court held while state findings of historical fact were binding on direct appeal, the ultimate issue of voluntariness is one of law.

In summary, by 1953 the Supreme Court had expressly held in at least eighteen reported cases that the ultimate question of the voluntariness of a confession is one of law. On direct appeal to the Supreme Court this legal determination was to be made on the basis of the undisputed historical facts. The Court characterized the ultimate issue as one of law because the police interrogations at issue were conducted in secret, coercive settings, and because federal review over these proceedings would be defeated on direct appeal were the ultimate issue one of fact.

### B. Habeas Corpus Review

In 1953 the Supreme Court examined the first coerced-confession claim to reach the Court in habeas corpus. *Brown v. Allen*, 344 U.S. 443, 73 S.Ct. 397, 97 L.Ed. 469 (1953).[8] In what is now standard fare to students of habeas corpus, the Court held in *Brown v. Allen* that the scope of review of the federal courts in habeas corpus exceeds that of the Supreme Court on direct appeal. While the direct-appeal doctrine limits the Supreme Court's review to the undisputed facts of record, the 1867 Habeas Corpus Act[9] creates the power in every case to readjudicate issues of historical fact decided by the state courts. 344 U.S. at 457–64, 73 S.Ct. at 407–11 (opinion of Reed, J.). Moreover, the Court held, in certain circumstances the federal courts were obliged to consider factual questions anew, in particular when the state courts failed to give "fair consideration to the issues and the offered evidence," *id.* at 463, 73 S.Ct. at

fact); *Marshall v. Lonberger*, 459 U.S. 422, 103 S.Ct. 843, 849, 74 L.Ed.2d 646 (1983) (voluntariness of guilty plea a question of law).

Of course, the Court overstated its point in *Haynes* and *Stein*. In some circumstances, a state finding on an ultimate issue dispositive of a claim of federal right is treated as a fact. *E.g.*, *Rushen v. Spain*, — U.S. —, 104 S.Ct. 453, 456, 78 L.Ed.2d 267 (1983) (per curiam) (jury bias); *Maggio v. Fulford*, 462 U.S. 111, 103 S.Ct. 2261, 2262–64, 76 L.Ed.2d 794 (1983) (per curiam) (competence to stand trial); *cf. Pullman-Standard v. Swint*, 456 U.S. 273, 287–88, 102 S.Ct. 1781, 1789–90, 72 L.Ed.2d 66 (1982) (federal district court finding of discriminatory intent treated as fact). Each issue must be analyzed independently with an eye for the policies and considerations relevant to classification as a

question of fact or law. In the case of voluntary confessions, those considerations were that police interrogations were conducted in secret, inherently coercive atmospheres, raising grave questions about what transpired during these proceedings. The Supreme Court feared time and again that claims of federal right would be defeated were the issue classified as one of fact.

**8.** *Brown v. Allen* involved three consolidated habeas petitions challenging methods of jury selection on equal protection grounds. The petitioner in *Brown* itself also challenged the admission of an allegedly coerced confession. 344 U.S. at 474–76, 73 S.Ct. at 416–17.

**9.** Act of Feb. 5, 1867, ch. 28, § 1, 14 Stat. 385, 385–86.

410 (opinion of Reed, J.), and when "a vital flaw be found in the process of ascertaining" the facts by the state courts. 344 U.S. at 506, 73 S.Ct. at 445 (opinion of Frankfurter, J.). However, the *Brown* Court held, conclusions of mixed law and fact are never binding in habeas corpus proceedings:

> Where the ascertainment of the historical facts does not dispose of the claim but calls for interpretation of the legal significance of such facts, ... the District Judge must exercise his own judgment on this blend of facts and their legal values. Thus, so-called mixed questions or the application of constitutional principles to the facts as found leave the duty of adjudication with the federal judge.

*Id.* at 507, 73 S.Ct. at 446 (opinion of Frankfurter, J.). The Court's review of the coerced-confession claim in *Brown*—a mixed question of law and fact—was plenary. 344 U.S. at 474–76, 73 S.Ct. at 416–17 (opinion of Reed, J.).

The "fair consideration" and "vital flaw" standards of *Brown v. Allen* soon proved bedevilling to the district courts.[10] In an effort to afford additional guidance on the question whether the district courts were obliged to relitigate issues of historical fact, the Supreme Court in *Townsend v. Sain*, 372 U.S. 293, 83 S.Ct. 745, 9 L.Ed.2d 770 (1963), refined the rules of *Brown v. Allen*. In lieu of the amorphous "fair consideration" and "vital flaw" standards of *Brown*, the Court substituted six arguably clearer standards.[11] In the event that a mandatory hearing is not required under these standards, the *Townsend* Court held, the district courts "may, and ordinarily

should, accept the facts as found in the [state] hearing. But [they] need not." 372 U.S. at 318, 83 S.Ct. at 760.

Congress codified the *Townsend* standards with little change in the 1966 amendments to the Habeas Corpus Act. 28 U.S.C. § 2254(d)(1)–(8) (1982); *see* Maj. op., at 1461 n. 7. The 1966 amendments retained the exception applicable when the state factual determination "is not fairly supported by the record." 28 U.S.C. § 2254(d)(8) (1982). In cases not falling within these exceptions, Congress added, state findings of historical fact "shall be presumed to be correct." 28 U.S.C. § 2254(d) (1982).

Neither *Townsend v. Sain* nor the 1966 amendments to the Habeas Corpus Act, however, altered the Supreme Court's doctrine that the federal courts sitting in habeas proceedings exercise plenary review over the ultimate legal issue in mixed questions of law and fact. The *Townsend* Court held:

> By "issues of fact" we mean to refer to what are termed basic, primary, or historical facts: facts "in the sense of a recital of external events and the credibility of their narrators ...." *Brown v. Allen,* 344 U.S. 443, 506 [73 S.Ct. 397, 446, 97 L.Ed. 469] [ (1953) ] (opinion of Mr. Justice Frankfurter). So-called mixed questions of fact and law, which require the application of a legal standard to the historical-fact determinations, are not facts in this sense.

372 U.S. at 309 n. 6, 83 S.Ct. at 755 n. 6. As recently as May of 1984 the Court reaffirmed that. the ultimate legal issue in a

---

**10.** *See Townsend v. Sain,* 372 U.S. 293, 310 & n. 8, 83 S.Ct. 745, 755–56 & n. 8, 9 L.Ed.2d 770 (1963) ("It has become apparent that the opinions in *Brown v. Allen, supra,* do not provide answers for all aspects of the hearing problem for the lower federal courts, which have reached widely divergent, in fact often irreconcilable, results").

**11.** *See* 372 U.S. at 313, 83 S.Ct. at 757:

> We hold that a federal court must grant an evidentiary hearing to a habeas applicant under the following circumstances: If (1) the

merits of the factual dispute were not resolved in the state hearing; (2) the state factual determination is not fairly supported by the record as a whole; (3) the fact-finding procedure employed by the state court was not adequate to afford a full and fair hearing; (4) there is a substantial allegation of newly discovered evidence; (5) the material facts were not adequately developed at the state-court hearing; or (6) for any reason it appears that the state trier of fact did not afford the habeas applicant a full and fair fact hearing.

mixed question of law and fact is not subject to the presumption of correctness of section 2254(d). *Strickland v. Washington*, —— U.S. ——, 104 S.Ct. 2052, 2070, 80 L.Ed.2d 674 (1984); *see Marshall v. Lonberger*, 459 U.S. 422, 103 S.Ct. 843, 849, 74 L.Ed.2d 646 (1983); *Sumner v. Mata*, 455 U.S. 591, 597, 102 S.Ct. 1303, 1306–07, 71 L.Ed.2d 480 (1982) (per curiam); *Cuyler v. Sullivan*, 446 U.S. 335, 342, 100 S.Ct. 1708, 1714, 64 L.Ed.2d 333 (1980); *Brewer v. Williams*, 430 U.S. 387, 403–04, 97 S.Ct. 1232, 1241–42, 51 L.Ed.2d 424 (1977).

Nor did the Court recede from its holdings that the voluntariness of a confession is such a mixed question of law and fact. As I note below, in over thirty decisions filed between the opinions in *Brown v. Allen* and *Sumner v. Mata*, the Supreme Court emphatically reaffirmed that voluntary-confession determinations are mixed questions of law and fact.

Thus, the evolving standards for the review of historical facts in habeas corpus proceedings had no effect on the voluntary-confession doctrine. That doctrine, that the ultimate question of the voluntariness of a confession is an issue of law, applied equally in direct appeals and habeas corpus.

## C. Coerced-Confession Claims from Brown v. Allen *to* Mincey v. Arizona

As increasing numbers of coerced-confession claims pressed for the Supreme Court's attention, the Court evinced mounting concern over the circumstances of police interrogations conducted in closed-door sessions. Between 1953 and 1966, the year of *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), the Supreme Court addressed no less than nineteen coerced-confession claims. During this period the Court reaffirmed that a confession may be extracted by psychological ploys as surely as by physical abuse. *Blackburn v. Alabama*, 361 U.S. 199, 206, 80 S.Ct. 274, 279, 4 L.Ed.2d 242 (1960);[12] *see Jackson v. Denno*, 378 U.S. 368, 389–90, 84 S.Ct. 1774, 1787–88, 12 L.Ed.2d 908 (1964); *Spano v. New York*, 360 U.S. 315, 321, 79 S.Ct. 1202, 1206, 3 L.Ed.2d 1265 (1959) (as "the methods used to extract confessions [become] more sophisticated, our duty to enforce federal constitutional protections does not cease. It only becomes more difficult because of the more delicate judgments to be made."). In all such cases, the Court held, the legal standard for voluntariness is whether the confession is "the product of a rational intellect and a free will." *Blackburn*, 361 U.S. at 208, 80 S.Ct. at 280. In the case of psychological coercion, the Court's assessment of voluntariness included consideration of the intensity and potential for deceit of any psychological pressure employed [13] in addition to the defendant's susceptibility to such pressure, as measured by the individual's maturity,[14] education,[15]

---

**12.** The Court in *Blackburn v. Alabama* held: Since *Chambers v. Florida*, 309 U.S. 227 [60 S.Ct. 472, 84 L.Ed. 716] [ (1940) ], this Court has recognized that coercion can be mental as well as physical, and that the blood of the accused is not the only hallmark of an unconstitutional inquisition. A number of cases have demonstrated, if demonstration were needed, that the efficiency of the rack and the thumbscrew can be matched, given the proper subject, by more sophisticated modes of "persuasion." A prolonged interrogation of an accused who is ignorant of his rights and who has been cut off from the moral support of friends and relatives is not infrequently an effective technique of terror.
361 U.S. at 206, 80 S.Ct. at 279 (footnote omitted).

**13.** *See Lynumn v. Illinois*, 372 U.S. 528, 534, 83 S.Ct. 917, 920, 9 L.Ed.2d 922 (1963) (investiga-

tors threaten defendant with loss of children); *Spano v. New York*, 360 U.S. 315, 321–24, 79 S.Ct. 1202, 1206–08, 3 L.Ed.2d 1265 (1959) (police officer, a "childhood friend" of the defendant, stated falsely that job was in jeopardy unless defendant confessed); *Leyra v. Denno*, 347 U.S. 556, 559–61, 74 S.Ct. 716, 718–19, 98 L.Ed. 948 (1954) (use of psychiatrist).

**14.** *See Gallegos v. Colorado*, 370 U.S. 49, 54, 82 S.Ct. 1209, 1212, 8 L.Ed.2d 325 (1962); *Payne v. Arkansas*, 356 U.S. 560, 567, 78 S.Ct. 844, 849, 2 L.Ed.2d 975 (1958); *Haley v. Ohio*, 332 U.S. 596, 599–601, 68 S.Ct. 302, 303–04, 92 L.Ed. 224 (1948).

**15.** *See Clewis v. Texas*, 386 U.S. 707, 712, 87 S.Ct. 1338, 1341, 18 L.Ed.2d 423 (1967); *Davis v. North Carolina*, 384 U.S. 737, 742, 86 S.Ct. 1761, 1764, 16 L.Ed.2d 895 (1966); *Harris v. South*

intelligence,[16] experience,[17] and physical condition.[18]

In each of these cases the Supreme Court reaffirmed that the ultimate determination of voluntariness is a mixed question of law and fact. Justice Frankfurter's encyclopedic opinion in *Culombe v. Connecticut*, 367 U.S. 568, 81 S.Ct. 1860, 6 L.Ed.2d 1037 (1961), for example, clearly distinguished between the underlying historical facts and the ultimate determination of voluntariness:

> The inquiry whether, in a particular case, a confession was voluntarily or involuntarily made involves, at the least, a three-phased process. First, there is the business of finding the crude historical facts, the external, "phenomenological" occurrences and events surrounding the confession. Second, because the concept of "voluntariness" is one which concerns a mental state, there is the imaginative recreation, largely inferential, of internal, "psychological" fact. Third, there is the application to this psychological fact of standards for judgment informed by the larger legal conceptions ordinarily characterized as rules of law but which, also, comprehend both induction from, and anticipation of, factual circumstances.

367 U.S. at 603, 81 S.Ct. at 1879 (opinion of Frankfurter, J.). The first of these determinations, the Court held, is one of historical fact. *Id.* However, the Court reiterated, the second and third phases are conclusions of law. *Id.* at 604–05, 81 S.Ct. at 1880–81. Justice Frankfurter made amply clear the reason for classifying these determinations as legal conclusions:

> No more restricted scope of review would suffice adequately to protect federal constitutional rights. For the mental state of involuntariness upon which the due process question turns can never be affirmatively established other than circumstantially—that is, by inference; and it cannot be competent to the trier of fact to preclude our review simply by declining to draw inferences which the historical facts compel.

*Id.* at 605, 81 S.Ct. 1880.

Reaffirmations of the rule that the ultimate question of voluntariness is one of law appear in every case decided during this period. *E.g., Reck v. Pate*, 367 U.S. 433, 81 S.Ct. 1541, 6 L.Ed.2d 948 (1961):

> The question whether there has been a violation of the Due Process Clause of the Fourteenth Amendment by the introduction of an involuntary confession is one which it is the ultimate responsibility of this Court to determine.

*Id.* at 435, 81 S.Ct. at 1543; *see also Haynes v. Washington*, 373 U.S. 503, 83 S.Ct. 1336, 10 L.Ed.2d 513 (1963):

> Our conclusion is in no way foreclosed, as the State contends, by the fact that the state trial judge or the jury may have reached a different result on this issue.

It is well settled that the duty of constitutional adjudication resting upon this Court requires that the question whether the Due Process Clause of the Fourteenth Amendment has been violated by admission into evidence of a coerced confession be the subject of an *independent* determination here ...; "we cannot escape the responsibility of making our own examination of the record," *Spano v. New York*, 360 U.S. 315, 316 [79 S.Ct. 1202, 1203, 3 L.Ed.2d 1265] [ (1959) ].

---

*Carolina*, 338 U.S. 68, 70, 69 S.Ct. 1354, 1355, 93 L.Ed. 1815 (1949).

**16.** *See Culombe v. Connecticut*, 367 U.S. 568, 620, 81 S.Ct. 1860, 1888, 6 L.Ed.2d 1037 (1961); *Reck v. Pate*, 367 U.S. 433, 441, 81 S.Ct. 1541, 1546, 6 L.Ed.2d 948 (1961); *Fikes v. Alabama*, 352 U.S. 191, 193, 77 S.Ct. 281, 282, 1 L.Ed.2d 246 (1957).

**17.** *See Thomas v. Arizona*, 356 U.S. 390, 394, 78 S.Ct. 885, 887, 2 L.Ed.2d 863 (1958); *Stein v.*

*New York*, 346 U.S. 156, 185–86, 73 S.Ct. 1077, 1093–94, 97 L.Ed. 1522 (1953); *Lisenba v. California*, 314 U.S. 219, 233–34, 62 S.Ct. 280, 288–89, 86 L.Ed. 166 (1941).

**18.** *See Townsend v. Sain*, 372 U.S. 293, 307–09, 83 S.Ct. 745, 754–55, 9 L.Ed.2d 770 (1963) (truth serum); *Clewis v. Texas*, 386 U.S. 707, 712, 87 S.Ct. 1338, 1341, 18 L.Ed.2d 423 (1967).

*Id.* at 515, 83 S.Ct. at 1344 (emphasis in original).

The Supreme Court's concern for the conduct of secret police interrogation reached a new level of acuity with the Court's incorporation of the privilege against self-incrimination as an element of due process applicable to the states through the fourteenth amendment. *Malloy v. Hogan,* 378 U.S. 1, 6–11, 84 S.Ct. 1489, 1492–95, 12 L.Ed.2d 653 (1964). That concern, in turn, led to the Court's well-known decisions in *Massiah v. United States,* 377 U.S. 201, 84 S.Ct. 1199, 12 L.Ed.2d 246 (1964), and *Escobedo v. Illinois,* 378 U.S. 478, 84 S.Ct. 1758, 12 L.Ed.2d 977 (1964)—pressing the sixth amendment right to counsel into service to protect the privilege against self-incrimination after the onset of adversary judicial proceedings, and before their onset in the circumstances defined in *Escobedo* [19]—and *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), requiring the recitation of warnings after the onset of custodial interrogation to enforce the privilege against self-incrimination.

The advent of these decisions enforcing the newly incorporated privilege against self-incrimination, however, did not change the Supreme Court's solicitude for scrutiny of confessions exacted by coercion. In 1978 the Court again affirmed that the ultimate question of the voluntariness of a confession is one of law. *Mincey v. Arizona,* 437 U.S. 385, 98 S.Ct. 2408, 57 L.Ed.2d 290 (1978):

> If, therefore, Mincey's statements to Detective Hust were not " 'the product of a rational intellect and a free will,' " *Townsend v. Sain,* 372 U.S. 293, 307 [83 S.Ct. 745, 754, 9 L.Ed.2d 770] [ (1963) ], quoting *Blackburn v. Alabama,* 361 U.S. 199, 208 [80 S.Ct. 274, 280, 4 L.Ed.2d 242] [ (1960) ], his conviction cannot stand. In making this critical determination, *we are not bound by the Arizona Supreme Court's holding that the statements were voluntary. Instead, this Court is under a duty to make an independent evaluation of the record.*

*Id.* at 398, 98 S.Ct. at 2416 (emphasis added). The majority now reasons that *Mincey v. Arizona,* and each of its direct-appeal predecessors, are now overruled.

It is important to understand the reason for this conclusion and the significance of its ramifications. As the majority properly notes, there is no distinction between the definition of "fact" for purposes of direct appeal and habeas corpus. Maj. op., at 1463 n. 12. Had the voluntariness of Mincey's confession been an ultimate question of fact, the Supreme Court would have asked only whether the Arizona courts had applied the proper legal standard—whether, under the totality of the circumstances, the defendant's will was overborne—in finding this fact. In *Mincey* there was no dispute that the Arizona courts had indeed applied the proper legal standard. If the question of voluntariness were one of ultimate fact, therefore, the Supreme Court would simply have affirmed, noting that the proper legal standard had been applied. Instead, holding that the ultimate question of voluntariness is one of law, the Court reversed, concluding as a matter of law that the confession was involuntarily made. Thus the majority reasons, with commendable candor, that *Mincey* is overruled. Similarly, the majority concludes that the entire direct-appeal line of decisions, and the direct-appeal doctrine itself in confession cases, have been reversed *sub silentio.*

The ramifications of this holding are of the highest order. In the majority's view, the Supreme Court itself is barred on direct

---

**19.** *See* 378 U.S. at 490–91, 84 S.Ct. at 1765: We hold, therefore, that where, as here, the investigation is no longer a general inquiry into an unsolved crime but has begun to focus on a particular suspect, the suspect has been taken into police custody, the police carry out a process of interrogations that lends itself to eliciting incriminating statements, the suspect has requested and been denied an opportunity to consult with his lawyer, and the police have not effectively warned him of his absolute constitutional right to remain silent, the accused has been denied "the Assistance of Counsel" in violation of the Sixth Amendment . . . .

appeal from making an independent determination of the voluntariness of a confession. That function, again in the majority's view, is open to the federal courts only in habeas corpus, and only when a state court "finding" of voluntariness is not fairly supported by the record as a whole. Thus, all independent federal scrutiny over confessions—both on direct appeal to the Supreme Court and in habeas corpus—would be gravely impaired. It is for precisely this reason that the Supreme Court has reiterated that the ultimate question of voluntariness is a mixed question of fact and law. And it is precisely this judgment of the Supreme Court that the majority today maintains has been overruled.

The majority's conclusion that this upheaval in Supreme Court jurisprudence was the work of *Miranda* is erroneous. Perhaps it is too simple to point out that the Supreme Court decided *Mincey v. Arizona* in 1978, twelve years after the Court's decision in *Miranda*. In *Mincey*, after all, *Miranda* warnings were not given;[20] it would be a sophism indeed to rely on *Miranda* as a foundation for doctrinal change when *Miranda* itself is violated. But there is no such distinction in *Hutto v. Ross*, 429 U.S. 28, 97 S.Ct. 202, 50 L.Ed.2d 194 (1976) (per curiam).[21] In *Hutto*, a habeas corpus

proceeding, the defendant had received *Miranda* warnings; indeed, he had also volunteered a confession with the advice and in the presence of counsel. *Hutto*, 429 U.S. at 29, 97 S.Ct. at 203. Despite the giving of *Miranda* warnings and the presence of counsel, the Court characterized the voluntariness of the confession as an ultimate issue of law. In particular, the Court did not apply section 2254(d) to the issue of voluntariness. The presence of counsel and giving of *Miranda* warnings were simply factors for consideration in the determination of voluntariness. *See Davis v. North Carolina*, 384 U.S. 737, 740–41, 86 S.Ct. 1761, 1763–64, 16 L.Ed.2d 895 (1966).

The theory that *Miranda* worked a doctrinal upheaval in Supreme Court jurisprudence may have been grist for an advocate's brief in *Hutto* and Mincey. It is not, however, a theory open to us as a inferior federal court bound by Supreme Court precedent. And it seems at least relevant that eight Federal Circuits have rejected the theory that *Miranda* altered the Supreme Court's voluntary-confession doctrine. Each of these courts addressing post-*Miranda* events has held that the ultimate question of the voluntariness of a confession is a one of law.[22]

---

**20.** Arizona officials in *Mincey* conceded the *Miranda* violation and sought to use the defendant's confession solely for impeachment, a use permitted by *Harris v. New York*, 401 U.S. 222, 91 S.Ct. 643, 28 L.Ed.2d 1 (1971). *See Mincey*, 437 U.S. at 397–98, 98 S.Ct. at 2416–17.

**21.** All other post-*Miranda* confession cases decided by the Supreme Court involved events antedating the *Miranda* decision. *Lego v. Twomey*, 404 U.S. 477, 92 S.Ct. 619, 30 L.Ed.2d 618 (1972); *Procunier v. Atchley*, 400 U.S. 446, 91 S.Ct. 485, 27 L.Ed.2d 524 (1971); *Frazier v. Cupp*, 394 U.S. 731, 89 S.Ct. 1420, 22 L.Ed.2d 684 (1969); *Boulden v. Holman*, 394 U.S. 478, 89 S.Ct. 1138, 22 L.Ed.2d 433 (1969); *Darwin v. Connecticut*, 391 U.S. 346, 88 S.Ct. 1488, 20 L.Ed.2d 630 (1968) (per curiam); *Greenwald v. Wisconsin*, 390 U.S. 519, 88 S.Ct. 1152, 20 L.Ed.2d 77 (1968) (per curiam); *Beecher v. Alabama*, 389 U.S. 35, 88 S.Ct. 189, 19 L.Ed.2d 35 (1967) (per curiam); *Clewis v. Texas*, 386 U.S. 707, 87 S.Ct. 1338, 18 L.Ed.2d 423 (1967); *Davis v. North Carolina*, 384 U.S. 737, 86 S.Ct. 1761, 16 L.Ed.2d 895 (1966). In each of these cases the Court affirmed that the ultimate question of

voluntariness is one of law without any suggestion that, had *Miranda* warnings been afforded, the issue would have been analyzed as one of fact.

**22.** *United States v. Castaneda-Castaneda*, 729 F.2d 1360, 1362–63 (11th Cir.1984); *Williams v. Maggio*, 727 F.2d 1387, 1390 & nn. 11–12 (5th Cir.1984); *Holleman v. Duckworth*, 700 F.2d 391, 396 (7th Cir.), *cert. denied*, — U.S. —, 104 S.Ct. 116, 78 L.Ed.2d 116 (1983); *United States v. Robinson*, 698 F.2d 448, 455 (D.C.Cir. 1983); *United States v. Tingle*, 658 F.2d 1332, 1333–36 (9th Cir.1981); *Jurek v. Estelle*, 623 F.2d 929, 934–36 (5th Cir.1980) (in banc), *cert. denied*, 450 U.S. 1001, 101 S.Ct. 1709, 68 L.Ed.2d 203 (1981); *Miller v. Maryland*, 577 F.2d 1158, 1159 (4th Cir.1978); *United States v. Brown*, 557 F.2d 541, 549–54 (6th Cir.1977). The First Circuit has also recently held that the determination of voluntariness is not subject to section 2254(d), but has not addressed the issue for events arising after *Miranda*. *Johnson v. Hall*, 605 F.2d 577, 581–83 (1st Cir.1979). Nothing in the First Circuit's decision, however, suggests that the court's analysis would change for post-

Finally, the majority's holding sends the wrong signal to law enforcement officers. Its message—obtain a *Miranda* waiver and only then employ "sophisticated modes of 'persuasion,'" *Blackburn*, 361 U.S. at 206, 80 S.Ct. at 279—renders the court's reliance on the prophylaxis of *Miranda* sophistical and offensive.

To summarize, as recently as 1978 the Supreme Court confirmed what it had held on some fifty prior occasions. A confession is voluntary if it is the product of a free will and a rational intellect. The ultimate question of the voluntariness of a confession is one of law. While the historical circumstances surrounding the making of a confession are subject to the strictures of section 2254(d), the conclusion of voluntariness is not. The presence or absence of *Miranda* warnings is simply one factor for evaluation under the totality of the circumstances.

### D. Recent Supreme Court Opinions

"Very weighty considerations," the Court has held, "underlie the principle that courts should not lightly overrule past decisions." *Moragne v. States Marine Lines, Inc.*, 398 U.S. 375, 403, 90 S.Ct. 1772, 1789, 26 L.Ed.2d 339 (1970). The Supreme Court does not make it a practice to overrule doctrines of long standing without a reasoned explanation of its judgment. *See Foremost Ins. Co. v. Richardson*, 457 U.S. 668, 672–77, 102 S.Ct. 2654, 2657–60, 73 L.Ed.2d 300 (1982); *United States v. Reliable Transfer Co.*, 421 U.S. 397, 401–11, 95 S.Ct. 1708, 1710–16, 44 L.Ed.2d 251 (1975); *Boys Markets, Inc. v. Retail Clerks Union*, 398 U.S. 235, 240–53, 90 S.Ct. 1583, 1586–94, 26 L.Ed.2d 199 (1970); *Moragne*, 398 U.S. at 403–05, 90 S.Ct. at 1789–90. This settled practice notwithstanding, the majority today holds that three recent Su-

preme Court decisions overruled *sub silentio* almost half a century of Supreme Court precedent on voluntary confessions. These cases had no such purport.

The first of these decisions, *Marshall v. Lonberger*, 459 U.S. 422, 103 S.Ct. 843, 74 L.Ed.2d 646 (1983), examined the voluntariness of a plea of guilty. The Supreme Court held:

We entirely agree with the Court of Appeals for the Sixth Court that the governing standard as to whether a plea of guilty is voluntary for purposes of the federal Constitution is a question of federal law ..... and not a question of fact subject to the requirements of 28 U.S.C. § 2254(d). But the questions of historical fact which have dogged this case from its inception—what the Illinois records show with respect to respondent's 1972 guilty plea, what other inferences regarding those historical facts the Court of Appeals for the Sixth Circuit could properly draw, and related questions—are obviously questions of "fact" governed by the provisions of § 2254(d).

103 S.Ct. at 849. *Marshall* obviously undermines any suggestion that the Court had receded from its view that the ultimate question of the voluntariness of a confession is one of law. To be sure, the Court noted that "inferences regarding those historical facts" are governed by section 2254(d). But the voluntariness of a guilty plea, the Court expressly held, is not such an inference.

Moreover, the policies that moved the Supreme Court to characterize the voluntariness of a confession as an ultimate issue of law are absent in the case of a plea of guilty. The Court has never reasoned superficially that the "voluntariness" of a confession concerns a "state of mind" and that all issues of "state of mind" could be

---

*Miranda* events. *See also United States v. Bienvenue*, 632 F.2d 910, 913 (1st Cir.1980) (issue analyzed as one of law for post-*Miranda*, noncustodial interrogation).

*Cf. Alexander v. Smith*, 582 F.2d 212, 217 (2d Cir.) (issue of fact), *cert. denied*, 439 U.S. 990, 99 S.Ct. 589, 58 L.Ed.2d 664 (1978); *Lyle v. Wyrick*, 565 F.2d 529, 532 (8th Cir.1977) (subsidiary is-

sues of fact presumed to have been found in conformance with legal conclusion when basis for state decision not specified), *cert. denied*, 435 U.S. 954, 98 S.Ct. 1585, 55 L.Ed.2d 805 (1978); *Castleberry v. Alford*, 666 F.2d 1338, 1342 (10th Cir.1982) (issue may be pure question of law, pure question of fact, or mixed question of law and fact).

classified *a priori* as either "fact" or "legal conclusion." Our legal characterizations have deeper truths. The Court describes the voluntariness of a confession as a legal issue because confessions are the product of police interrogation generally conducted in closed proceedings and inherently coercive settings. The truth is difficult to penetrate in these proceedings; in order to prevent the shielding of claims of federal right on direct appeal to the Supreme Court, the Court retained a measure of power to draw independent inferences from the historical facts of record. But no such circumstances are present during the allocution of a guilty plea. These pleas are entered in open court under prescribed conditions with the benefit of counsel and with a full stenographic record of the allocution. Nothing could be further from the inherently coercive setting of secret police interrogation. Thus the need for independent federal review of the voluntariness of guilty pleas is less acute than that for confessions obtained during police interrogation. And yet the Supreme Court in *Marshall* reaffirmed that the voluntariness of even a guilty plea entered in open court is a mixed question of law and fact. If *Marshall v. Lonberger* speaks at all to voluntary confessions, it counsels more strongly than ever that the voluntariness of a confession is an ultimate issue of law.

The remaining two cases on which the majority relies—*Rushen v. Spain,* — U.S. ——, 104 S.Ct. 453, 78 L.Ed.2d 267 (1983) (per curiam), and *Maggio v. Fulford,* 462 U.S. 111, 103 S.Ct. 2261, 76 L.Ed.2d 794 (1983) (per curiam)—also do not affect the voluntary-confession doctrine. Both of these cases are per curiam summary reversals decided without briefing or argument; it would be extraordinary, to say the least, if the Supreme Court intended two per curiam summary dispositions to overrule a half century of Supreme Court doctrine. But of course they do not. Neither case addresses the voluntariness of a confession. *Maggio* arguably holds that a defendant's competence to stand trial is an issue of fact subject to section 2254(d), notwithstanding the contrary holding of *Drope v. Missouri,* 420 U.S. 162, 174–75 & n. 10, 95 S.Ct. 896, 905–06 & n. 10, 43 L.Ed.2d 103 (1975). Like the entry of a guilty plea, however, the defendant's competence to stand trial is adjudicated in open court after a competence hearing, *Pate v. Robinson,* 383 U.S. 375, 385–86, 86 S.Ct. 836, 842–43, 15 L.Ed.2d 815 (1966). The trial court witnesses all of these proceedings and renders credibility findings; counsel is generally present unless that right is waived; and a stenographic record is prepared for the purpose of appellate review. The policies requiring a measure of independent federal scrutiny over confessions obtained during secret police interrogation apply with far less force to the determination of the competence of a witness to stand trial made after a *Pate* hearing.

*Rushen* holds that the effect of *ex parte* communications on the impartiality of a juror is a question of fact subject to section 2254(d). This unremarkable conclusion is wholly consistent with the voluntary-confession doctrine. Although such *ex parte* communications do take place outside of the presence of the trial court, they do not occur in the inherently coercive setting of police interrogation and, more importantly, do not implicate the danger of self-incrimination of the defendant. The need for independent federal scrutiny of the impact of *ex parte* communication on the jury is far more attenuated than that appropriate to the confession of a defendant offered at trial. In drawing this conclusion the *Rushen* Court nowhere even alluded to the voluntary-confession doctrine.

In short, the suggestion that *Marshall,* *Maggio,* and *Rushen* overruled the voluntary-confession doctrine *sub silentio* is simply ludicrous. That doctrine retains the vitality it has enjoyed for almost fifty years. It may be the prerogative of a majority of the Supreme Court "to overrule, *sub silentio,* a century of precedents," as Justice Roberts put it. *James v. Dravo Contracting Co.,* 302 U.S. 134, 161, 58 S.Ct. 208, 221, 82 L.Ed. 155 (1937) (Roberts, J., dissenting). It is not, however, within the power of this court. We under-

mine the "public faith in the judiciary as a source of impersonal and reasoned judgments," *Moragne,* 398 U.S. at 403, 90 S.Ct. at 1789, by abandoning such a longstanding judicial practice on so patently baseless a ground. The court's holding raises the gravest questions respecting adherence to the principle of *stare decisis* and concerning the appropriate role of an inferior federal tribunal in deeming so weighty a Supreme Court doctrine overthrown by so meager a force.

To the extent that *Patterson v. Cuyler* reasoned that *Marshall, Maggio,* and *Rushen* overruled the voluntary-confession doctrine, it reasoned incorrectly. *Patterson*'s holding, however, is merely that the voluntariness of a *Miranda* waiver is an issue of fact.[23] As such, it would not control our decision here even if the Supreme Court had been silent on the issue of voluntary confessions. *Miranda* waivers, of course, are generally obtained in closed proceedings. But there the similarity to confessions ends. A *Miranda* waiver is not inculpatory; rather, it is an agreement to accede to questioning until the permission is withdrawn. *Edwards v. Arizona,* 451 U.S. 477, 484–85, 101 S.Ct. 1880, 1884–85, 68 L.Ed.2d 378 (1981). The policies requiring independent federal review of confessions exacted during police interrogation do not apply with equal force to a mere permission to begin questioning. And as a practical matter, *Miranda* waivers are generally evinced by signed writings. When a *Miranda* waiver is effected not by such a writing but by a defendant's unilateral statement to the police, *Edwards* holds that the validity of the waiver is a mixed question of law and fact. *See* note 22 *supra. Patterson* makes no effort to reconcile its conclusion with this aspect of the Supreme Court's holding in *Edwards.*

The majority suggests that *Patterson*'s reading of the "trend" of recent Supreme Court decisions has been reinforced by the Court in *Patton v. Yount,* —— U.S. ——, 104 S.Ct. 2885, 81 L.Ed.2d 847 (1984). Quite to the contrary, *Patton* directs the opposite conclusion. In *Patton* the Court held that the bias of a single juror is an issue of fact. —— U.S. at ——, 104 S.Ct. at 2890–2893. The Supreme Court arrived at that conclusion only after assessing the relevant reasons for categorization of the issue as a question of fact or law. The Court held:

> There are good reasons to apply the statutory presumption of correctness to the trial court's resolution of these questions. First, the determination has been made only after an often extended *voir dire* proceeding designed specifically to identify biased veniremen. It is fair to assume that the method we have relied on since the beginning ... usually identifies bias. Second, the determination is essentially one of credibility, and therefore largely one of demeanor. As we have said on numerous occasions, the trial court's resolution of such questions is entitled, even on direct appeal, to "special deference." ... The respect paid such findings in a habeas proceeding certainly should be no less.

—— U.S. at ——, 104 S.Ct. at 2892.

These policies do not and never have applied to an assessment of the voluntariness of a confession. The task at hand is

---

**23.** Even this holding appears to be infirm. By so holding, *Patterson* places this Circuit in conflict with *Edwards v. Arizona,* 451 U.S. 477, 484–87, 101 S.Ct. 1880, 1884–86, 68 L.Ed.2d 378 (1981). *Edwards,* a direct appeal to the Supreme Court, does not treat the validity of a *Miranda* waiver as a question of fact. Although the Arizona Supreme Court in *Edwards* applied an erroneous legal standard for assessing voluntariness—the court applied the fourth amendment standard of *Schneckloth v. Bustamonte,* 412 U.S. 218, 226, 93 S.Ct. 2041, 2047, 36 L.Ed.2d 854 (1973), rather than the standard of *Johnson v. Zerbst,* 304 U.S. 458, 58 S.Ct. 1019, 82 L.Ed. 1461 (1938)—the Supreme Court also held as a matter of law that on the historical facts presented, the defendant's statement "did not amount to a valid waiver." 451 U.S. at 486–87, 101 S.Ct. at 1885–86. Thus, *Edwards* treats the ultimate question of the validity of a *Miranda* waiver as a conclusion of law.

Unfortunately, *Patterson* does not cite or distinguish *Edwards.* Because no petition for rehearing in *Patterson* was filed, the panel opinion's consistency with *Edwards* has not been addressed by this Circuit.

not an assessment of an individual's present state of mind. Rather, the issue is whether, during a past closed proceeding, an individual's will was overborne. This is not a determination of demeanor; it is not the case that the defendant testifies that his will was overborne, the officers testify that his will was not overborne, and the trial court, assessing their demeanor, finds who is telling the truth. The determination of voluntariness requires the drawing of inferences from past events and circumstances. Those circumstances and events, of course, are "facts"—the "external, 'phenomenological' occurrences and events surrounding the confession," as Justice Frankfurter put it. *Culombe*, 367 U.S. at 603, 81 S.Ct. at 1879. But the inference whether the defendant's will was overborne is an independent conclusion. The fact-finder is not present during the giving of the confession. The defendant's voice is not heard. The interrogators' methods are not seen. The fact-finder seeks instead to reconstruct the defendant's mental state after developing a record. The reviewing court is as capable of drawing that inference from the cold facts as is the trial court. *Patton's* holding concerning juror bias, measured in court after a searching *voir dire*, consequently sheds no illumination on whether the voluntariness of a confession obtained during interrogation is an inference of fact or law. And *Patton's* admonition to attend to the purposes served by classification of an issue as "fact" or "law" detracts from the majority's position. The Supreme Court characterizes a confession's voluntariness as an ultimate question of law because federal review over custodial police interrogation would be frustrated if the ultimate issue were a pure question of fact.

Thus, even if we were writing on a clean slate, *Patterson's* holding concerning *Miranda* waivers would not compel the same holding for voluntary confessions. Significantly different policies and circumstances pertain to these issues. But of course we are not writing on a clean slate. A half century of unwavering Supreme Court precedent already compels the conclusion that the voluntariness of a confession is an ultimate issue of law.

IV.

Finally, I dissent from the majority's deference to a finding of "fact" that the New Jersey courts neither made nor purported to make. Applying the voluntary-confession doctrine, those courts treated their conclusion of voluntariness as one of law. The premise for deference under section 2254(d) to a state finding of fact is therefore altogether wanting.

The state trial court made a number of findings of historical fact. For example, the court observed that Miller had been "at the police barracks about almost two hours before this questioning started during which time I find from the testimony was not interrogated about this situation." Tr. at 145; *see* note 1 *supra*. The court treated the issue of voluntariness, in contrast, as one of law. "I think that the interview conducted by Detective Boyce meets the requirements of our law," the trial court held. Tr. at 146. "I don't consider that the offers of help made by Detective Boyce were such that they … overcame the will of the defendant which would make this confession involuntary." The court's reliance on *State v. Puchalski*, 45 N.J. 97, 100–01, 211 A.2d 370, 372 (1965), and *Schneckloth v. Bustamonte*, 412 U.S. 218, 223–27, 93 S.Ct. 2041, 2045–48, 36 L.Ed.2d 854 (1973), clearly indicate that the trial court regarded this determination as a legal conclusion.

Similarly, in its unanimous reversal of the trial court, the New Jersey Appellate Division held that the trial court's conclusion was one of law. Under New Jersey law, the findings of the trial courts are binding on appeal unless they suffer, for example, from a "manifest lack of inherently credible evidence to support the finding, [or an] obvious overlooking or under evaluation of crucial evidence." *State v. Johnson*, 42 N.J. 146, 162, 199 A.2d 809, 818 (1964). Applying this standard, the Appellate Division sustained the trial court's findings of historical fact. "[T]he judge

found," the court held, "in findings adequately supported by credible evidence in the whole record (*State v. Johnson*, 42 N.J. 146, 199 A.2d 809 (1964)), that *Miranda* warnings were given and in a timely manner." 76 N.J. at 413, 388 A.2d at 228. The Appellate Division did not, however, apply the *State v. Johnson* standard of appellate review to the trial court's conclusion of voluntariness. Rather, after reciting the trial court's conclusion of law, the Appellate Division held that "We are clearly persuaded of error in this determination." *Id.*

In like fashion, the New Jersey Supreme Court treated the trial court's conclusion as one of law. "We have no quarrel," that court held,

> with the legal principles expressed by the Appellate Division. We disagree, though, with its evaluation of the techniques and tactics used by the officer who questioned [the] defendant, as well as its conclusion that defendant's confession was involuntary in the constitutional sense.

76 N.J. at 402, 388 A.2d at 223. The dissent, in a discussion with which the majority did not take issue, was even more explicit. "As to the scope of appellate review," the dissenting opinion observed, "since the issue is of constitutional dimension and is one of mixed fact-law, the reviewing court conducts a sweeping surveillance of the question practically the equivalent of *de novo* redetermination." 76 N.J. at 411–12, 388 A.2d at 228 (footnote omitted). In the case of "contested issues as to subordinate facts involving credibility of witnesses," the court added, "deference may be accorded any fact-findings thereon by the trial judge." *Id.* at 412 n. 1, 388 A.2d at 228 n. 1.

Thus, all eleven New Jersey judges who reviewed this confession held that the determination of the voluntariness of Miller's confession is one of law. Yet in disregard of these legal conclusions, the majority today recharacterizes their holding as one of "fact." Section 2254(d) does not require that we ignore the legal conclusions of the state courts in this fashion. That section

provides that "a determination after a hearing on the merits of a factual issue, made by a State court of competent jurisdiction ... shall be presumed to be correct" unless one of the exceptions set forth in that section is established. 28 U.S.C. § 2254(d) (1982). Because none of the state courts even purported to treat the ultimate question of voluntariness as one of fact, there is no basis for deferring to any such factual conclusion under section 2254(d).

## V.

"Nothing that we write," as Justice Stevens has put it, "no matter how well reasoned or forcefully expressed, can bring back the victim of this tragedy ...." *Brewer v. Williams*, 430 U.S. 387, 415, 97 S.Ct. 1232, 1247, 51 L.Ed.2d 424 (1977) (Stevens, J., concurring). But the tragic circumstances of the crime before us cannot diminish our respect for constitutional principle. A conviction obtained by a confession exacted by coercion, whether psychological or physical, violates due process. Miller's confession was the product of a will overborne by deceit, trickery, and promises of help if only he would confess. Confess he did, in an overwrought physical state requiring medical attention. A confession extracted by these psychological ploys from a defendant of unstable mental disposition and childlike maturity after an intense grilling cannot be squared with due process.

Rather than meet our responsibility to examine the voluntariness of Miller's confession independently, however, the majority characterizes this determination as a question of "fact" and purports to defer to state "findings" on this issue—findings, of course, that were never made, for the New Jersey courts faithfully adhered to the Supreme Court's consistent holding that the voluntariness of a confession is an issue of law. The majority's decision is squarely inconsistent with almost half a century of Supreme Court precedent. We have no power to treat so cavalierly the reasoned decisions of some fifty Supreme Court

precedents; we certainly have no warrant for supposing that they have been overruled *sub silentio* by two summary per curiam dispositions of the Supreme Court addressing other issues.

I cannot join in this judgment. I dissent.